OPINION OF THE COURT
Martin Schoenfeld, J.
In this action the State of New York (plaintiff) alleges (1) that the First Investors group of companies (First Investors) violated New York’s General Business Law by misrepresenting the nature of certain mutual fund shares that the companies were selling; and (2) that certain principals of the companies violated New York’s Debtor and Creditor Law by withdrawing money from the companies when the underlying circumstances, and/or the effects of the instant lawsuit, made it improper to do so. Plaintiff now moves (1) for leave to file an amended complaint; (2) to nullify certain transactions; (3) for the appointment of a receiver; and (4) to restrain defendants from "dissipating” their property.
BACKGROUND
For present purposes First Investors consists of a holding company named First Investors Consolidated Corp. (FICON) and two subsidiaries: First Investors Corp. (FIC), a securities broker-dealer; and First Investors Management Company, Inc. (FIMCO), an investment advisor that manages First Investors’ mutual funds. From 1985 through 1989 First Investors derived approximately $260 million in commissions and fees from selling shares in defendant First Investors Fund for Income, Inc. (FIFI), and defendant First Investors High Yield Fund, Inc. (FIHY) (collectively, The Funds). Most of The Funds’ assets were invested in so-called "junk bonds”. From 1987 through 1989 $2.5 billion was invested in The Funds, 20% by New Yorkers.
On or about January 17, 1990 plaintiff began an investigation, pursuant to New York’s "Martin Act” (General Business Law § 352 et seq.) of the practices used to sell shares in The Funds, and First Investors was so informed. On or about *211 March 21, 1990 FIC notified its directors and officers liability insurance carriers of the investigation. Meanwhile, in a February 1, 1990 prospectus FICON stated that "it is unlikely that [FICON] will pay dividends at any time in the near future.” Nevertheless, at a "special meeting” held on April 24, 1990, FICON’s three directors — defendant Glenn Head (chairperson and 34% owner of FICON); defendant David Grayson (president and 34% owner of FICON) and John T. Sullivan (an outside director) — voted approval of a $14 million cash dividend (The Dividend). Pursuant thereto, on May 10, 1990, a total of $9.5 million was paid to Grayson and Head and a total of $1 million was paid to defendants Howard Froman and Alvin Blumenfeld (FIC sales executives).
According to plaintiff, a partner in FICON’s long-standing public accounting firm stated that The Dividend was the first ever paid by FICON; that the accounting firm had not been consulted about The Dividend; that The Dividend was not declared pursuant to any "tax or financial planning advice”; and that The Dividend was paid without any advance determination of whether money was available to pay for it after considering the probable claims of creditors and before any reserve for lawsuit losses had been created. Michael S. Miller, who became the chief executive officer of FIC after the events here in issue, states that The Dividend was "a perfectly proper business transaction” effected because a portion of 1989 earnings had been earmarked for a stock repurchase from an outside investor that did not come to pass; and that outside counsel (whom Miller does not name) assured the company that The Dividend was proper.
On March 6 and May 8, 1990, Froman received $3.7 million and Blumenfeld received $1.6 million in repurchases by FI-CON of some of their minority shares (The Repurchases). Froman states that in February of 1990, when he had no knowledge of plaintiff’s investigation, he sold back one third of his FICON shares; that he initiated discussions concerning his repurchases in 1989, "before there appears to have been any investigation”; that he sold the shares in order to pay off loans used to purchase the shares; that when he sold another one third of his shares, on May 8, 1990, he had no idea that anything other than a "routine inquiry” was occurring; that this second sale was made at the suggestion of an accountant to make use of a tax "loss” on the sale of a restaurant he owned; and that he always paid "full value” for his FICON shares and still retains 50,000 of them. Blumenfeld states that *212 in the latter part of 1989, "before there appears to have been any investigation at all”, he initiated discussions concerning selling shares back to FICON; that he too sold the shares in order to pay off loans used to purchase the shares; that the decision to sell was made before he knew that there was any investigation; that he sold less than one third of his shares back to FICON; and that he purchased his shares for full value.
On or about March 28, 1990, FICON transferred $5 million into First Investors Life Insurance Co. (FILIC), a FICON subsidiary, as a capital contribution (The FILIC Transfer). Returning this money to FICON would require the approval of New York’s and other States’ insurance regulators. Miller states that FILIC needed the transfer to prevent "having its rating lowered.” (Note — The Dividend, The Repurchases, and The FILIC Transfer will be collectively referred to as The Contested Transactions.)
PROCEDURAL HISTORY
Plaintiff’s original verified complaint alleged that defendants had made oral material misstatements and omissions, had disseminated misleading prospectuses, and had sold securities that were unsuitable for the purchasers thereof, all in violation of the Martin Act. This complaint essentially demanded (1) that defendants be permanently enjoined from engaging in the securities business within New York State; (2) that the non-Fund defendants be required to make restitution of all proceeds of the alleged fraudulent practices; and (3) that a receiver be appointed pursuant to General Business Law § 353-a to take possession of fraudulently obtained property. Defendants served a joint answer essentially denying that they had engaged in any wrongdoing.
In a December 14, 1990 stipulation (the December 1990 Stipulation) defendants agreed (1) to stop selling shares in The Funds (except upon 30 days’ notice to plaintiff); (2) to notify The Fund’s shareholders of the pendency of the instant action; (3) to refrain from transfers of assets except for reasonably equivalent value; and (4) to provide plaintiff with timely financial information concerning defendants.
Plaintiff’s proposed amended complaint would add a cause of action alleging that The Contested Transactions violated Debtor and Creditor Law §§ 273, 274, and 276. The amended complaint would also add a demand for judgment requiring that the non-Fund defendants make restitution and pay dam *213 ages pursuant to General Business Law § 353 (3); that The Contested Transactions be adjudged fraudulent; that the non-Fund defendants be restrained from dissipating their assets; and that a receiver be appointed, pursuant to Debtor and Creditor Law § 279 and CPLR 6401, to "take charge” of the assets conveyed in The Contested Transactions.
DISCUSSION
"Permission to amend pleadings should be 'freely given’ (CPLR 3025, subd [b]). The decision to allow or disallow the amendment is committed to the court’s discretion.” (Edenwald Contr. Co. v City of New York, 60 NY2d 957, 959 [1983].) As recently stated, "in the absence of prejudice or unfair surprise, requests for leave to amend should be granted freely.” (Daniels v Empire-Orr, Inc., 151 AD2d 370, 372 [1st Dept 1989].) Thus the request to amend the complaint is granted.
Plaintiffs requests to restrain defendants from "dissipating” their property; to nullify The Contested Transactions; and to have a receiver appointed are all equitable in nature, and thus plaintiff must meet the threshold requirements for preliminary injunctive relief: (1) a likelihood of success on the merits; (2) irreparable injury absent the granting of a preliminary injunction; and (3) a balancing of the equities which favors the movant’s position (Aetna Ins. Co. v Capasso, 75 NY2d 860, 862 [1990]). In State of New York v Fine (72 NY2d 967, 969 [1988]), the Court of Appeals held that while the Attorney-General must make a showing of all three requirements for preliminary equitable relief in order to be granted a preliminary injunction in a Martin Act suit, "[i]nasmuch as the Martin Act has a broad remedial purpose to protect the public interest, it may present its own special considerations in determining what is irreparable injury and in balancing equities.”
General Business Law § 352-c outlaws, in the sale of securities, "[a]ny fraud, deception, [or] concealment” and "[a]ny representation or statement which is false, where the person * * * (i) knew the truth; or (ii) with reasonable effort could have known the truth.” Section 353 authorizes plaintiff to seek injunctive relief and restitution. Section 353-a authorizes court appointment of a receiver "of any and all property derived by the defendant * * * by means of any such fraudulent practices”.
In an affidavit a former employee of First Investors states that from 1973 until October of 1988 Froman and Blumenfeld *214 directed a sales organization known as "the Scarsdale Complex”; that Froman and Blumenfeld directed and/or participated in the creation of the FIC sales materials and techniques utilized by the Scarsdale Complex; that Grayson and Head "had knowledge of the sales scripts and sales materials in use in the Scarsdale Complex”; that the suitability of a given investment for a given investor was not a factor in the selling thereof; and that shares in The Funds were represented as being "safe” and "investment-grade” when The Funds’ assets were, as noted above, actually invested in "junk bonds.”
In response, defendants have submitted quotes from The Fund’s prospectuses and scripted sales presentations which state, essentially, that investing in The Funds entailed a higher risk than investing in bank deposits, etc. In reply, plaintiff states (1) that "[defendants’ junk bond funds were sold to unwitting investors through an aggressive oral solicitation campaign of calculated deception and not through the mere dissemination of prospectuses to experienced investors sophisticated enough to discern risk in defendants’ artfully worded prospectus”; and (2) that most of the cautionary language in the prospectuses was added "in both December 1989 and in 1990 pursuant to awakened SEC vigilance” and after many investors had been "ensnared”. (See, Zobrist v Coal-X, Inc., 708 F2d 1511, 1515-1519 [10th Cir 1983], for a discussion of the factors to be considered in determining whether a particular investor justifiably relied on oral statements of nonrisk by a seller of securities when the relevant prospectus indicated the existence of risk.)
The court finds that plaintiff is likely to prevail on its claim that the individual defendants, The Funds, and FIC violated General Business Law § 352-c. (See, People v Federated Radio Corp., 244 NY 33, 37, 38-39 [1926] [Martin Act "remedial in its character” and condemns as fraud "all acts, although not originating in any actual evil design or contrivance to perpetuate fraud or injury upon others, which do by their tendency to deceive or mislead the purchasing public come within the purpose of the law”]; State v Rachmani Corp., 71 NY2d 718, 725, n 6 [1988] [neither scienter nor intentional fraud is an element of a Martin Act violation]; People v Essner, 124 Misc 2d 830, 833-834 [Sup Ct, NY County 1984] [reliance and scienter not elements of a Martin Act violation]; Clark v Lamula Investors, 583 F2d 594, 599-600 [2d Cir 1978] [selling "unsuitable” securities violates Federal securities laws].) The *215 court also finds that the equities balance in favor of plaintiff, as it appears likely that certain defendants have violated General Business Law § 352, and plaintiff is attempting to protect the public interest in this lawsuit. However, as plaintiff has not claimed that defendants are currently or are about to (1) violate the December 1990 Stipulation or (2) engage in any fraudulent conduct in the sale of securities, the court finds that plaintiff will not suffer irreparable injury absent the appointment of a receiver pursuant to General Business Law §353.
The question of the appointment of a receiver pursuant to General Business Law § 353-a is far more problematic. Of course, the general rule is that: " '[C]ourts of equity exercise extreme caution in appointing receivers pendente lite because such appointment results in the taking and withholding of possession of property from a party without an adjudication on the merits’ * * * In the absence of clear proof of the danger of irreparable loss or damage, and proof that a receiver is necessary for the protection of the parties to the action and their interests, a temporary receiver should not be appointed.” (Groh v Halloran, 86 AD2d 30, 33-34 [1st Dept 1982]; accord, First Natl. Bank v Caputo, 124 AD2d 417, 418 [3d Dept 1986].) In the instant case, any receiver appointed pursuant to section 353-a would only have authority to take possession of "property derived by the defendants] * * * by means of’ their allegedly fraudulent practices. While it appears that the wording of section 353-a might apply here such that this court would have the authority to appoint a receiver thereunder, the court, in its discretion, feels that the better practice will be to deny the appointment of a receiver at this time, since there does not appear to be any threat of irreparable injury, or at least none that the appointment of a receiver at this time would obviate.
Plaintiff claims that The Contested Transactions all violate Debtor and Creditor Law §§273, 274 and 276. Section 273 basically deems as fraudulent conveyances made without fair consideration by a person who is or will be rendered thereby insolvent (there is no "intent” requirement). Section 274 basically deems as fraudulent conveyances made without fair consideration when the person making it is engaged in a business for which the property remaining in his hands after the conveyance is an unreasonably small capital (again, there is no "intent” requirement). Conversely, section 276 deems as fraudulent conveyances made with actual intent to hinder, *216 delay or defraud creditors (there is no "insolvent” or "lack of consideration” requirement).
The FILIC Transfer did not lack fair consideration since FILIC was a subsidiary of FICON. However, the payment of a dividend is a conveyance lacking fair consideration under the Debtor and Creditor Law. (United States v 58th St. Plaza Theatre, 287 F Supp 475, 497-498 [SD NY 1968].) Furthermore, "a stock redemption by an insolvent company fails to supply reasonably equivalent value to the company.” (In re Joshua Slocum, Ltd., 103 Bankr 610, 618 [ED Pa 1989]; accord, In re Roco Corp., 701 F2d 978, 982 [1st Cir 1983].) Thus, The Dividend and The Repurchases would have violated Debtor and Creditor Law § 273 when made if, and only if, First Investors was insolvent at that time.
Plaintiffs contention that First Investors was insolvent at the time of The Contested Transactions rests largely on plaintiffs claim that First Investors was already liable to the "victims” of defendants’ allegedly fraudulent practices for restitution of commissions and fees and for damages based on the investors’ market losses. Plaintiff claims that as of 1990 FICON’s equity available to satisfy shareholder claims was $22.4 million and that this amount was only about 1.4% of its legal liabilities in this case (infra).
Assistant Attorney-General William H. Mohr states that from 1985 through 1990 defendants derived more than $260 million in commissions and fees from sales of The Funds; that during this period investors suffered $1.37 billion in market losses; and that "restitution” to defrauded investors would thus entail $1.6 billion, a figure more than 50 times greater than the sums available. More particularly, plaintiff claims that as of June 30, 1990, 88% of FIFI’s assets were invested in junk bonds; that FIFI’s net assets declined from $1.7 billion in June of 1989 to $971 million on June 30, 1990; that as of July 1, 1989, 90% of FIHY’s assets were invested in junk bonds; that FIHY’s net assets declined from $747 million on December 31, 1989 to $640 million on June 30, 1990; that FIFI’s and FIHY’s share value fell 40% and 37%, respectively, from June 30, 1989 to December 31, 1990, resulting in approximately $888 million in investors’ losses; that for the period ending December 31, 1989, as reflected in financial statements available to the defendants at the time of The Contested Transactions, total losses for FIFI and FIHY were $874,514,984; and that even if purchasers of only 10% of FIFI’s and FIHY’s shares were the victims of misrepresentation, the restitution *217 due them, $160 million, would be five times the total stockholder equity of FICON.
Michael Miller responds that plaintiffs figure of $1.37 billion for alleged market losses sustained by The Funds for the four years ending December 31, 1990 ignores the fact that the losses incurred during 1989-1990 were virtually all recovered during 1991; that in any event plaintiffs figure of $1.37 billion in losses should be reduced (i) by $192 million to reflect "gains” incurred from January 1, 1991 through October 24, 1991; (ii) by $137 million due to a "simple mathematical error”; and (iii) by $1.008 billion due to plaintiffs failure to account for "net investment income distributed to investors or reinvested on behalf of investors [i.e., dividends] in that amount.” Plaintiff replies that most Fund investors never realized any "gains” from these "dividends” since 70% of investors reinvested the dividends in The Funds and that the reinvested "dividends” declined in value with the shares.
A partner at First Investors’ primary outside accounting firm states that FICON was not insolvent at the time of The Contested Transactions; that as of December 31, 1989 FICON had "reported stockholders’ equity of approximately $83 million”; that as of December 31, 1990 FICON had "reported stockholders’ equity of approximately $76 million”; that FI-CON was actually worth more than the $83 million book value of its outstanding shares; that contrary to plaintiff’s assertion, and for "several reasons” (e.g., plaintiff’s calculations omit both "net investment income earned” and "gains earned by investors prior to the limited time period 1987 to 1990 used by the State to calculate losses”), First Investors was not liable for a total restitution of $1.6 billion to investors at the time of The Contested Transactions; that at the time of The Contested Transactions as a matter of general accounting practice, no liability attached to First Investors pursuant to the instant suit since (1) it was not "probable” that there would be a loss, and (2) as an independent ground, the amount of any loss could not reasonably be estimated. Defendants note that plaintiffs damage calculations assume that every investor in First Investors was the victim of fraud, whereas a plaintiff in a securities fraud suit can only collect net losses which stem from defendant’s fraudulent act(s) (see, Abrahamson v Fleschner, 568 F2d 862, 878 [2d Cir 1977]). Plaintiff rejoins that "a contingent liability * * * must be reduced to its present, or expected, value before a determination can be made whether the firm’s assets exceed its liabilities.” (Matter *218 of Xonics Photochemical, 841 F2d 198, 200 [7th Cir 1988] ["(t)o value (a) contingent liability it is necessary to discount it by the probability that the contingency will occur”].)
While this court fails to see the relevance of the 1991 "recovery” on the issue of First Investor’s solvency in early 1990, and while we think it "probable” that First Investors will suffer a "loss” in the instant suit, we are not sufficiently persuaded that First Investors was, or was rendered, insolvent in the spring of 1990. Questions persist as to, e.g., the percentage of The Funds investors who were defrauded; the time and price at which they purchased and sold their shares; and the facts concerning, and the accounting treatment to be accorded, their dividends. In the absence of sufficient proof of insolvency (and in the absence of any discussion of the "reasonable” capital needs of a business like First Investors) Debtor and Creditor Law §§ 273 and 274 are of no avail to plaintiff.
However, invocation vel non of Debtor and Creditor Law § 276 is an altogether different matter. New York courts have a long history of scrutinizing the transfers of judgment debtors. Even prior to New York’s adoption of the Uniform Fraudulent Conveyance Act (UFCA), the Court of Appeals, in Cole v Tyler (65 NY 73, 77-78 [1875]), held that a transfer without consideration by an insolvent debtor is "presumptively or prima facie fraudulent”, placing the burden on the debtor to prove that the transfer was for a reasonable purpose and that the debtor retained sufficient means to pay his or her debts after the conveyance. (Accord, Monticello Mut. Bldg. & Loan Assn. v Rapp, 235 App Div 304, 306 [1st Dept 1932].)
After adoption of the UFCA, in Altman v Finkel (268 App Div 666 [1st Dept], affd 295 NY 651 [1945]), the First Department stated that under Debtor and Creditor Law § 276, fraudulent intent is a question of fact, not of law, and that "[a]ctual intent to defraud, or fraud in fact, like any other fact, may be shown by circumstantial evidence.” (Supra, at 668-669.) The Court there found actual intent to defraud based on the debtor’s having transferred his property without consideration to his wife at the time that he was engaged in "speculative enterprises.” (Supra, at 670.)
More recently, in Scola v Morgan (66 AD2d 228 [1st Dept 1979]), the First Department found that several parcels of real property had been transferred with an actual intent to defraud in light of the following: (1) the transfers were made without consideration, (2) the transferor was rendered insol *219 vent, (3) the transfers were made to a shell corporation controlled by the transferor’s wife, (4) the transfers were made shortly after the underinsured transferor learned that he might be liable to a third party for a substantial judgment, and (5) the transferor continued to act as the owner of the properties for some time after the transfers. In the instant case, we have found that there is not, at this time, sufficient proof of insolvency in 1990 to invoke Debtor and Creditor Law §§273 and 274. However, that does not mean that First Investors was not in financial difficulty, and possibly catastrophically so. (See also, Mishkin v Kenney & Branisel, 609 F Supp 1254, 1256-1257 [SD NY] [Debtor and Creditor Law § 279 injunction granted since "defendants (were) currently engaged in efforts to dispose of their assets” and since "(t)heir past fraudulent conduct and their current actions indicate an intent to defeat and defraud the rights of * * * creditors”], affd 779 F2d 35 [1985].)
This court does not lightly impute fraud. Furthermore, "[f]raud may not be assumed in the absence of any evidence to justify its existence, and the burden of showing [a] conveyance to have been executed in fraud of creditors is on those asserting it * * * A conveyance in fraud of creditors must [under Debtor and Creditor Law § 276] be based on an actual intent which may not rest on mere suspicion.” (Lupia v Lupia, 199 NYS2d 733, 735 [Sup Ct, Suffolk County I960]; see also, Rosenthal v Rochester Button Co., 148 AD2d 375, 376 [1st Dept 1989] [" 'From disposition of the property no presumption of intent to defraud arises. Such intent must be proved, and the facts relied upon to prove it must be fully set out in the moving affidavits’.”]) However, this court does not view Debtor and Creditor Law §276 as an empty exercise in legislative drafting. After careful consideration, we find that The Dividend was made with actual intent to hinder, delay or defraud First Investors’ future creditors, is fraudulent as to them, and pursuant to Debtor and Creditor Law § 279, must be and hereby is set aside. This court finds particularly noteworthy — and disturbing — that the February 1, 1990 prospectus stated that FICON was "unlikely” to "pay dividends at any time in the near future”; that a $14 million cash dividend was declared at a "special meeting” in April of 1990; that two of the three directors who voted to declare The Dividend received a total of $9.5 million therefrom; that The Dividend appears to have been the first ever paid by FICON; and that The Dividend appears not to have been declared *220 pursuant to any "tax or financial planning advice”. In light of the foregoing, Miller’s vague assertions about an unspecified, aborted stock repurchase and assurances from anonymous outside counsel are, we find, unavailing as a matter of law. On the other hand, the detailed affidavits from Froman and Blumenfeld (supra) preclude application of Debtor and Creditor Law to The Repurchases at this time. Also, while the unspecified assertion that The FILIC Transfer was necessary to prevent FILIC’s "having its rating lowered” hardly removes all doubt about the true motive thereof, since the transfer was not without consideration and may, in practical effect, be irrevocable, we will not set it aside at this time.
Plaintiff claims that FIC is losing approximately $1.5 million per month on operations; that money is being "siphoned” from FIMCO, which is operating at a profit, to FIC; that the cash advances from FIMCO to FIC are not being evidenced by any notes; that in any event any such notes would not be "reasonably equivalent value”; and that these transfers violate the December 1990 Stipulation’s ban on transfers lacking fair consideration. Miller responds that it is common in the mutual fund industry for a management company (here, FIMCO) to operate at a profit and to subsidize a sister sales company (here, FIC). Given the interdependency of the First Investors "family” of companies, this court does not, at this time, see anything improper in the FIMCO-FIC transfers.
In State of New York v Kozak (91 Misc 2d 394 [Sup Ct, NY County 1977]), the court enjoined Martin Act defendants from transferring or disposing of their allegedly fraudulently derived assets in light of the Attorney-General’s prima facie case of fraud and the possibility of financial instability on the part of defendants. (Cf., Firemen’s Ins. Co. v Keating, 753 F Supp 1146, 1153 [SD NY 1990] [request for asset freeze injunction based on "risks of the current, unpredictable economic climate, defendants’ payments to other creditors, gifts, poor business decisions, etc.” denied].)
Given plaintiff’s likelihood of success in this action, and the large sums of money involved, the court finds that it is equitable to impose an asset freeze injunction on the non-Fund defendants in the exact same form as defendants voluntarily agreed to in the December 1990 Stipulation (and pursuant to which they have, by their own account, conducted their respective affairs for the last IV2 years).
*221 CONCLUSION
Thus for the reasons set forth herein plaintiffs requests to amend the complaint, to set aside The Dividend, and to freeze the non-Fund defendants’ assets are granted. All other requests for relief are denied.
[Portions of opinion omitted for purposes of publication.]