Richard A. LIPPE, Archie R. Dykes, and John J. Robbins, as Trustees for Keene Creditors Trust, Plaintiffs,

v.

**BAIRNCO CORPORATION et al., Defendants.**

No. 96 CIV. 7600(DC).

United States District Court, S.D. New York.

March 14, 2003.

Levy Phillips & Konigsberg, LLP by Stanley J. Levy, Esq., Brian T. Fitz-Patrick, Esq., Benjamin Schneider, Esq., Lizabeth Burrell, Esq., New York City, Saiber Schlesinger Satz & Goldstein, LLC by David R. Gross, Esq., Geoffrey Gaulkin, Esq., Christopher Chiafullo, Esq. Whitney Chelnik, Esq., James H. Gianninoto, Esq., Christina Dente, Esq., Newark, NJ, Budd Larner Rosenbaum Greenberg & Sade, P.C. by Kathleen Marchetti, Esq., William D'Annunzio, Esq., Anthony DiMaggio, Esq., Short Hills, NJ, for Plaintiffs.

Debevoise & Plimpton by John H. Hall, Esq., Steven Klugman, Esq., Jeremy Feigelson, Esq., J. Paul Oetken, Esq., Steve Vaccaro, Esq., Jennifer R. Cowan, Esq., Caroline H. Luckenbach, Esq., Ross Hirsch, Esq., Schulte Roth & Zabel LLP by Irwin J. Sugarman, Esq., Brooks R. Burdette, Esq., David K. Momborquette, Esq., Michael S. Chernis, Esq., Mary Morabito Rosewater, Esq., Aron Egan Weiss, Esq., New York City, McCarter & English, LLP by Charles F. Rysavy, Esq., Alissa Pyrich, Esq., Newark, NJ, Abowitz, Timberlake & Dahnke, P.C. by Murray E. Abowitz, Esq., Oklahoma City, OK, for Defendants.

## OPINION

CHIN, District Judge.

In 1993, after more than 100,000 asbestos lawsuits had been brought against it, Keene Corporation ("Keene") filed for bankruptcy. In this case, plaintiffs, the Trustees of the Keene Creditors Trust (the "Trust"), contend that Keene knew in the early 1980s, more than a decade before it went into bankruptcy, that someday it would be overrun by asbestos personal injury cases. Plaintiffs contend that Keene and its management consequently concocted a grand scheme to engage in a series of corporate transactions to hide Keene's assets from future asbestos claim-

ants. Plaintiffs allege that Keene carried out this series of fraudulent conveyances over the course of the 1980s with the assistance of its lawyers and outside auditors.

Plaintiffs have been unable, however, to support their theory with any concrete evidence. To the contrary, on the record before the Court, no reasonable jury could find that Keene and its officers, directors, lawyers, and auditors engaged in any scheme to defraud. Although the asbestos cases were a real concern to Keene as early as the 1970s, the evidence shows, as a matter of law, that there were no fraudulent conveyances here. Instead, a reasonable jury could only find that the transactions were legitimate. The purchasing entities gave Keene $273.6 million in consideration for the transferred assets, and plaintiffs have presented no admissible evidence to show that less than fair value was paid. Moreover, Keene had more than $390 million in insurance coverage for the asbestos claims as well as other substantial assets. Keene could not predict the future, and it had no reason to know, at the time of the transfers, that years later it would be rendered insolvent by a flood of asbestos filings.

Before the Court are the motions of defendants Bairnco Corporation ("Bairnco"), Kaydon Corporation ("Kaydon"), the Genlyte Group, Inc. ("Genlyte"), Kasco Corporation ("Kasco"), Shielding Systems Corporation ("Shielding"), Arlon, Inc. ("Arlon"), and Glenn W. Bailey for summary judgment dismissing the amended complaint. Also before the Court are two additional motions filed by plaintiffs after the summary judgment motions were filed, briefed, and argued: a motion to substitute a new valuation expert or alternatively to submit a supplemental expert report and a motion to supplement the summary judgment record.

Plaintiffs' motions are denied, for plaintiffs have had a full and fair opportunity to litigate this case and defendants would be severely prejudiced if discovery and the record were reopened now. Accordingly, I decide the summary judgment motions on the basis of the existing record. Based on that record, I conclude that no reasonable jury could find in favor of plaintiffs. Defendants' motions are granted and plaintiffs' claims are dismissed.

## BACKGROUND

### A. The Facts

The facts are summarized in the Court's prior decisions in this case. *See, e.g., Lippe v. Bairnco Corp.*, 288 B.R. 678, 681–85 (S.D.N.Y.2003); *Lippe v. Bairnco Corp.*, 230 B.R. 906, 908–11 (S.D.N.Y. 1999); *Lippe v. Bairnco Corp.*, 225 B.R. 846, 850 (S.D.N.Y.1998); *Lippe v. Bairnco Corp.*, 218 B.R. 294, 297–300 (S.D.N.Y. 1998).

For purposes of these motions, I set forth the facts in detail, based on the evidence presented, drawing all reasonable inferences and resolving all conflicts and ambiguities in the evidence in favor of plaintiffs.

### 1. The Asbestos Liabilities

#### a) The Onset of Claims

Keene was created in 1967 when Bailey and others took over a small packaging company and renamed it Keene Corporation. (Bailey Dep. at 104–06, 108–09). With Bailey as its Chairman and President, Keene was conceived as a conglomerate—a corporation with businesses in different industries. (Bailey Decl. ¶¶ 2, 24).

In 1968, Keene acquired the Baldwin–Ehret–Hill Company ("BEH") for about $8 million. BEH was in the insulation business and its products contained asbestos. Keene operated the business through a subsidiary, and it stopped manufacturing asbestos products in 1972. (Bailey Dep. at 126–32; Bailey Decl. ¶ 3).

In 1971, the first asbestos personal injury case was brought against BEH and Keene. (DX 6). During the 1970s, the number of asbestos cases filed against Keene increased from 32 in 1975 to 1,506 in 1979. (DXs 8, 20, 31). In 1979, a jury rendered a $450,000 verdict against Keene in the *Lopez* case in Florida. (DX 25).

#### b) Keene's Response

In 1975, Keene established an Asbestos Task Force to address its asbestos litigation. Keene also hired Anderson, Russell, Kill & Olick ("ARKO") to pursue coverage litigation against its insurers as well as lawsuits against BEH's suppliers. (DXs 9, 10, 12, 75 at DP 1033928–29; Bailey Decl. ¶¶ 4–6; Metzger Dep. at 62–63; Herner Dep. at 47–49; Mileaf Dep. at 30–32).

The *Lopez* verdict led Keene to devote more attention to the asbestos litigations, and by 1980, Keene had developed a comprehensive program to deal with the asbestos cases. (Bailey Decl. ¶¶ 5–6; Herner Dep. at 121–22; Mileaf Decl. ¶ 3; DXs 25, 26). By the start of 1980, 2,367 cases were pending against Keene around the country. (DX 31). At that time, Keene's average per-case disposition cost was about $3,300, which covered 326 cases, including the *Lopez* case, the net cost of which was $280,000 (the $450,000 verdict less amounts paid by other defendants). (DX 32 at LIPPE 113115, 113121). These figures did not include defense costs.

As it made a greater effort to address the asbestos claims after the *Lopez* verdict, Keene had some success. From 1984 through 1990, it won defense verdicts in 366 of the 379 cases it tried to verdict, a 97% success rate, and the average damages award in the 3% of cases it lost was

only $14,780—a total of $192,143 in adverse verdicts in the seven-year period. (DX 485 at PETERS 10026).[1] From 1985 through 1987, Keene obtained defense verdicts—zero recovery—in *all* 148 cases tried to verdict. (*Id.*). Although most of the cases that had been filed through 1980 were considered by Keene to be meritorious (DX 450 at LIPPE 96361), by 1980 Keene saw more and more of what it judged to be meritless—or "junk"—cases. (DXs 82, 162, 228; *see, e.g.,* DXs 93, 112 (in *Billy Bell* cases, many claims withdrawn and remainder settled for average of less than $800 per case)).

In June 1985, Keene and approximately 30 other asbestos defendants formed the Asbestos Claims Facility (the "ACF") to resolve asbestos claims jointly. (DX 538; *see also* DX 275 at LIPPE 382686–91). The ACF rules required each member to make settlement payments in every case, regardless of whether it had been sued by the particular claimant. (DX 275 at LIPPE 382732–33; Herner Dep. at 497–99). Keene was not happy with its experience in the ACF and it withdrew in 1988, along with certain other members. (DX 391 at LIPPE 382377).

In 1988, Keene and 20 other former ACF members formed the Center for Claims Resolution (the "CCR"). (*Id.* at LIPPE 382378; DX 548). The CCR was similar in concept to the ACF, but costs were allocated for each case according to each member's market share in the industry or trade in question. (DX 391 at LIPPE 382394). Keene resolved large numbers of claims in the CCR through 1990, including more than 20,000 claims in 1989. (DX 485 at PETERS 10019). In 1990, however, Keene left the CCR because it believed that too many non-meritorious claims were being settled. (DX 433; Mileaf Dep. at 233; Bailey Decl. ¶ 14).

### c) *Insurance*

During the 1970s, Keene made efforts to clarify and maximize its insurance coverage. Two insurers were defending and indemnifying Keene, but other insurers disavowed coverage. In 1978, Keene sued its liability insurance carriers in a coverage action. Keene prevailed in the district court in part. *Keene Corp. v. INA,* 513 F.Supp. 47, 50–51 (D.D.C.1981). In October 1981, on appeal, the District of Columbia Circuit gave Keene an even greater victory as the court broadened both the coverage and the duty to defend. *Keene Corp. v. INA,* 667 F.2d 1034, 1041, 1050–51 (D.C.Cir.1981). The Supreme Court denied certiorari in March 1982. 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

The *INA* decision was significant, for it resolved any continuing doubts about the availability of insurance coverage. Keene's available insurance coverage effectively totaled some $390 million, not including defense costs that were to be absorbed by Keene's insurers without charge to policy limits. (DXs 98, 101, 131 at DP 1044024, 436 at BZ 111684 n. 9; Bailey Decl. ¶¶ 6–8). Members of Keene management have stated under oath that, with the *INA* decision, they believed that Keene had more than enough insurance to cover its asbestos liabilities. (Bailey Decl. ¶¶ 7–9; Mileaf Decl. ¶¶ 6, 7; Bertrand Dep. at 23). ARKO partners also believed the insurance coverage of $390 million was more than enough to cover all asbestos claims. (Anderson Dep. at 130, 245; Herner Dep. at 440).

There were excess and property damage insurers to pursue as well. (DXs 131, 139 at LIPPE 209241–42, 209249). Keene la-

---

1. The average verdict for all 379 cases together was $506.97.

ter confirmed an additional $13.5 million in coverage and negotiated $23 million more in coverage upon its withdrawal from the ACF. (Vaccaro Decl. ¶ 5; DX 391 at LIPPE 382377). Keene also recouped asbestos-related defense costs by virtue of the insurance: from 1982 through 1990, Keene received more than $93 million in coverage for defense costs outside of policy limits. (Vaccaro Decl. ¶¶ 9–10).

### d) *The Forecasts*

In its 1980 first quarter 10–Q, Keene reported that it could not reasonably estimate the number of future asbestos-related claims. (DXs 38, 54 at AA 526–27). Keene's outside auditor, Arthur Andersen & Co. ("Andersen"), told Keene that if Keene could not provide an estimate of these liabilities, "[Andersen] cannot be expected to give an unqualified opinion" of Keene's 1980 financial statements. (DX 38; *see* Denkensohn Dep. at 164; Trivisonno Dep. at 226–28, 230–31, 308–10, 317). As a consequence, Keene sought to develop a realistic forecast, in light of the constraint that "nobody [could] predict the future." (Herner Dep. at 301, 308; Mileaf Decl. ¶¶ 5, 6).

One consideration was the latency period for the manifestation of asbestos-related diseases, which ranged, depending on the disease, from 15 to 35 years. (DX 18 at LIPPE 50712). Keene made some analyses, looking at randomly selected sample cases and considering when claimants had been exposed to asbestos. (*See* DX 73 at LIPPE 50057; Herner Dep. at 314–32, 608–36).

In a January 21, 1981 letter to Andersen, Keene estimated that some 30,000 new asbestos cases would be filed against it over the course of the next eight years. (DX 74 at LIPPE 49934). This was in addition to the 5,950 cases then pending, for an estimate of 35,950 cases total. (*Id.* at LIPPE 49939). Keene estimated that "[t]he average settlement or cost" was $2,800, not including defense costs. Settlements had been averaging $3,700 per case, but that included a $280,000 settlement in the *Lopez* case. Keene came up with the $2,800 figure by removing *Lopez,* which it considered had been mishandled, and factoring in the lower cost of settling the California and Mississippi cases. (*Id.* at LIPPE 49934, 49938).

In the letter, Keene estimated that "the present value of assumed settlements" was $9.234 million, which represented 12.2% of Keene's pro forma net worth. (*Id.* at LIPPE 49935, 49939; *see* DX 68 at LIPPE 333876). The $9.234 million figure was the present value of what Keene expected it would have to pay, after factoring in taxes and insurance coverage. (DX 74 at 49934–35, 49939). This forecast was made, however, before the Court of Appeals ruled in the *INA* decision in October 1981. (*Id.*).

Upon review of the letter, and based on its prior analyses as well, Andersen concluded that Keene's estimate of future liabilities was reasonable. Andersen gave Keene's financial statements an unqualified—or clean—opinion. (DX 77; *see* DX 68 at LIPPE 333875; Bailey Decl. ¶ 15).

In January 1982, Keene provided Andersen with an update of its asbestos forecast, based in part on its actual experience for 1981. (DX 113). During 1981, 4,573 cases had been filed, compared to the 5,500 cases that had been estimated previously. (*Id.* at LIPPE 49752; *see* DX 74 at LIPPE 49939 (predicting 5500 cases would be resolved in 1984 and assuming three-year life for cases)). Keene continued to predict that 30,000 new cases would be filed over the next eight years. (DX 113 at LIPPE 49752). The average settlement or cost per case, net of defense costs, was estimated to range from between $2,000 to $5,000,

increasing in the long term. (*Id.* at LIPPE 49752–53).

Keene estimated the present value of the cost to be $10.599 million, or 11.4% its pro forma net worth. (*Id.* at 49756, 49764). Again, this factored in taxes and insurance coverage: although Keene estimated that all the cases filed through 1991 would cost in excess of $100 million to resolve, after tax adjustments and insurance coverage, and discounted to present value, Keene estimated its cost to be $10.599 million. (*Id.* at 49753, 49756, 49764). In addition, although the Court of Appeals had by now ruled in the *INA* case, Keene continued to take a more conservative approach in its forecast because a petition for certiorari was pending in the Supreme Court. As Keene noted, however, "[i]f [the Court of Appeals's] decision stands . . ., Keene's financial liability for asbestos cases should be significantly reduced." (*Id.* at 49754–55). In fact, two months later, the Supreme Court denied the petition for certiorari. *INA v. Keene Corp.*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

In January 1983, Keene again wrote to Andersen to report on the status of asbestos claims. Keene noted that its 1983 report was substantially different from prior reports for two reasons: the *INA* insurance litigation and the bankruptcy filing in 1982 of Johns–Manville Corporation ("Manville") and its affiliates. (DX 139 at LIPPE 209229; *see* Mileaf Decl. ¶ 7). Keene noted that approximately 5,000 cases were filed in 1982, as compared to the previously predicted number of 5,500 cases. It noted that Keene continued to believe that, together with pending cases, approximately 36,500 cases would be filed against it. (DX 139 at 209231). Keene noted that in the Manville bankruptcy proceedings, Manville had projected that 52,000 cases would be filed against it. (*Id.* at

209232). It further noted that because Keene had not been named in all the lawsuits against Manville, the Manville projection "tends to support our previous projections." (*Id.*). As for insurance, Keene reported that it had at least $386.5 million in available insurance. (*Id.* at 209240). Keene also had a reserve fund of $15,329,859 for the asbestos case expenses as of December 31, 1982. (*Id.* at 209242). Keene concluded that the cost—including defense costs—to resolve all the predicted cases would be approximately $196.69 million. (*Id.* at 209247).

From 1984 through 1986, Keene continued to make estimates each year of anticipated asbestos claims. It continued to conclude that the available insurance was more than adequate to cover the estimated total cost of the asbestos claims. (*See* Bairnco Mem. at 22 (chart) (citing Vaccaro Decl. ¶ 11; DXs 139, 196, 252, 275)).

In 1987, Keene reported that it could not estimate the number of future cases because of the increasingly unpredictable rate of new case filings. (DX 322 at LIPPE 389727, 389735). In fact, the number of cases filed had grown from 5,102 in 1983 to 6,222 in 1984 to 9,168 in 1985 to 12,906 in 1986. (*Id.* at 389748). The 1986 figure included all cases against all ACF producers, while the prior numbers were claims against Keene only. (*See* DX 341 at LIPPE 389845). Nonetheless, Keene concluded that "despite the continued high rate of new case filings, Keene believes, based on the facts available to it today, that there is sufficient insurance available to handle existing and possible future cases." (DX 322 at 389740).

In January 1988, Keene again reported to Andersen, and again it declined to forecast the number of future cases. (DX 341 at LIPPE 389844, 389855). Keene noted that new case filings for 1987 (against all ACF Producers) had increased to 23,039.

(*Id.* at 389845). Keene's average share of total indemnity costs was $4,960 per case in 1987, $4,028 per case in 1986, and $3,691 per case in 1985. (*Id.* at 389846). Keene continued to state its view that it had sufficient insurance coverage to cover the claims, as it had "at least $390,000,000" for the period from 1956 through 1982. (*Id.* at 389867). It also had a reserve of some $18 million set aside for the asbestos claims as of the end of 1987. (*Id.* at 389873).

In January 1989, Keene again reported to Andersen, and again it declined to forecast the number of future cases. (DX 391 at LIPPE 382376). It noted that by the end of 1988, there were approximately 65,385 cases pending against members of the Center (which was created in 1988), as opposed to 59,542 cases pending against those same companies as of year-end 1987. (*Id.* at 382382). Significantly, Keene reported also that there had been a decline in the number of new case filings and an increase in the rate of disposition of cases. In 1988, there were 17,982 new filings (including both the ACF and the Center) as opposed to 23,039 new filings in 1987 (cases against all ACF Producers). (*Id.* at 382383–84). Keene also reported that its share of total indemnity costs had dropped on a per-case basis from $4,641 for ACF cases to $2,980 for Center cases. (*Id.* at 382385). Keene also reported that the amount of its insurance coverage for the period 1956 through 1982 had actually increased, to $413 million, because of an additional $23 million in coverage received in 1988. (*Id.* at 382402). Of this amount, some $159 million had been used, leaving some $254 million. (*Id.* at 382404). In addition, Keene still had an $18 million reserve for the asbestos cases. (*Id.* at 382408). Keene concluded:

> We believe that when all factors are taken into account based on the information available to us today, acknowledging that we have not predicted any particular number of cases to be filed, that there will be sufficient available insurance when added to Keene's reserve that the personal injury asbestos case liability and the property damage asbestos case liability will not have a material adverse effect on the financial position of Keene at December 31, 1988.

(*Id.* at 382376).

### e) *The Manville Case*

When Manville filed for bankruptcy in 1982, Keene looked to Manville's experience as a check on its own forecasts. Manville was the "industry leader" and had a much larger market share than Keene in terms of asbestos products. (Mileaf Decl. ¶ 7). Manville had projected that some 52,000 cases would be filed (DX 139 at Lippe 209232; *see* Bailey Decl. ¶ 12), and Manville was publicly criticized at the time by members of the plaintiffs' asbestos bar—including Stanley Levy, one of the Trust's attorneys in this case—as exaggerating the number of future claims. (DXs 128, 187 at LIPPE 87516, 87519, 87541). Keene took note of this criticism. (*See* Bailey Decl. ¶¶ 11–12; Mileaf Decl. ¶ 7; Herner Dep. at 464 ("I got the plaintiffs' lawyers themselves saying this is about how many—the plaintiffs' lawyers actually saying that the ERI report was too high because it was stating a number of cases that were too high."); *see* DX 139 at LIPPE 209229, 209232–34).

In the Manville bankruptcy case, certain parties moved to dismiss the petition on the grounds, in part, that Manville had filed its petition in bad faith because it had overstated the "problem of uncontrolled proliferation of asbestos health suits." *In re Johns–Manville Corp.*, 36 B.R. 727, 729 (Bankr.S.D.N.Y.1984). The court denied the motions to dismiss, holding that "Manville has credibly analyzed its position." *Id.* at 734.

By August 1986, however, for purposes of establishing the Manville Personal Injury Settlement Trust, the parties involved in the Manville proceedings were estimating that between 83,000 and 100,000 claims would be filed at $25,000 per claim. (DX 541 at CND 1018272, 1018358).

#### f) *The Views as to Keene's Solvency*

ARKO, Keene's counsel and experts in asbestos litigation, represented to Andersen each January from at least 1980 through 1990 that it was ARKO's opinion that the asbestos cases would not have a material adverse effect on Keene's financial condition. (DXs 530 (1980), 75 (1981), 114 (1982), 535 (1983), 195 (1984), 251 (1985), 540 (1986), 544 (1987), 342 (1988), 390 (1989), 435 (1990)). In essence, each year ARKO advised Keene and Andersen that in its view the asbestos claims did not render Keene insolvent. (*See, e.g.,* Herner Dep. at 442–43).

Likewise, from 1980 through 1988, after evaluating the impact of the asbestos claims, Andersen gave Keene (or Bairnco) a "clean" opinion on its financial statements. (DXs 68 at LIPPE 333875 (1980), 106 at BZ 119941 (1981), 137 at BZ 97900 (1982), 188 at BZ 119690 (1983), 247 (1984), 269 at BZ 119346 (1985), 315 at BZ 1003268 (1986), 340 at BZ 119140 (1987), 387 at BZ 16201 (1988)). The 1988 report was certified by Andersen on January 23, 1989. (DX 387 at BZ 1003268). These opinions were based not just on Keene's representations and ARKO's opinions, but also on Andersen's own research and analyses. (*See, e.g.,* DXs 268, 316, 327, 338, 381, 382, 386, 401, 498).

Keene's managers and lawyers have stated under oath, in affidavits and in deposition testimony, that throughout the 1980s at least through the dates of the transactions at issue in this case, they never believed that Keene was insolvent or would be rendered insolvent by virtue of the asbestos cases. (*See, e.g.,* Bailey Decl. ¶¶ 15, 22, 23; Cafiero Dep. at 207–08; Prata Dep. at 71–72; Betrand Dep. at 23; Conway Dep. at 152–53; Mahoney Dep. at 89). Their testimony is corroborated by numerous contemporaneous documents showing that its managers believed that Keene was going to survive or that the worst was over. For example, in a document relied on heavily by plaintiffs, Keene's general counsel, Howard Mileaf, acknowledged in June 1981 that there was the potential for thousands of claimants "to show up every year," but he also predicted:

> [T]he whole problem should reach a crescendo by 1990 or earlier at which point Keene's status will become measurable and a fairly routine procedure will be established . . . .

> Keene's leadership role in the insurance, supplier and government lawsuits puts the company in a unique . . . position to *survive and indeed, flourish during this period.*

(PX 203 at LIPPE 51600–01 (emphasis added)).

#### g) *Keene's Net Worth*

Keene's financial statements showed its net worth at year-end for each year in the 1980s through 1991 as follows:

| | |
|---|---|
| 1980 | $ 70.7 million |
| 1981 | $ 84.7 million |
| 1982 | $ 94.0 million |
| 1983 | $105.9 million |
| 1984 | $117.7 million |
| 1985 | $120.1 million |
| 1986 | $116.5 million |
| 1987 | $123.3 million |
| 1988 | $127.8 million |
| 1989 | $131.7 million |
| 1990 | $133.3 million |
| 1991 | $134.1 million |

(Bailey Decl. ¶ 55; *see also* DX 501 at KELT 3521; Tersigni Dep at 318–19

(agreeing Keene's net worth showed "a general upward trend through 1990")).

At least in the later years, a substantial part of Keene's net worth was the result of substantial amounts of cash and other liquid assets on hand. As of December 31, 1987, Keene had more than $75 million in cash and other liquid assets. That amount increased to almost $110 million as of December 31, 1988 and to more than $140 million as of December 31, 1989. (Fichthorn Decl. ¶ 43; *see* Bairnco Mem. at 179 (chart with citations to financial statements)).

## 2. *The Transactions*

At the end of the 1970s, Keene's management decided that the company should move away from being a large conglomerate. Although defendants have provided evidence that Keene's management felt that the company's earnings were depressed because of its nature as a conglomerate (*see, e.g.,* DXs 48, 49; Bailey Dep. at 605–06), plaintiffs have presented evidence that a substantial consideration was also Keene's growing concern over the increasing number of asbestos claims. I assume, for purposes of this motion, that Keene was seeking ways to address the adverse impact that asbestos cases were having on its value and earnings. Indeed, Keene began to consider restructuring.

One proposal was for Keene to "spin-off" its Kaydon division. In this connection, Keene sought legal advice from Debevoise, Plimpton, Lyons & Gates ("Debevoise"). On November 21, 1980, Debevoise provided a memorandum to Keene's board of directors. (DX 62; *see* DX 63).

The memorandum addressed a number of matters, including issues presented by the asbestos cases. Specifically, Debevoise raised the issue whether the proposed spin-off—which, as contemplated, did not call for the payment to Keene of *any* consideration—could later be attacked as a fraudulent conveyance. (DX 62 at LIPPE 52954–55). Debevoise concluded that "Keene should not undertake the Spin-off" unless the board believed that enough assets would be "left behind" to meet all liabilities of Keene, "whenever and however incurred," and Keene would not be rendered insolvent. (*Id.* at LIPPE 52954).[2]

Based on Debevoise's advice, Keene decided that it could not go forward with the proposed spin-off—one that involved the payment of no consideration. (Bailey Dep. at 629–33; Fichthorn Decl. ¶ 12).

Eventually, however, Keene management proceeded to restructure. It created Bairnco to serve as a holding company to acquire businesses for development and potential eventual spin-off. (DXs 64, 66, 68 at LIPPE 33386, 80, 106). Bairnco was formed on April 30, 1981. (DXs 89 at LIPPE 365470, 106 at BZ 119927).

Keene engaged in five transactions or sets of transactions that are challenged by plaintiffs in this action: (a) Kaydon; (b) Genlyte; (c) Kasco; (d) Shielding Systems, consisting of (1) Shielding Businesses and (2) Versitron and Micro Chassis; and (e) Arlon.

## (a) *Kaydon*

In July 1982, Keene created the original Kaydon Corporation ("Old Kaydon"),

---

**2.** In mid–1980, Keene also sought advice from Weil, Gotshal & Manges ("Weil Gotshal"). Weil Gotshal wrote two memoranda, one on the dischargeability of asbestos tort claims (PX 125) and one on reorganization issues. (PX 127). The first concluded that it was not clear that asbestos tort claims would be discharged in bankruptcy. (PX 125 at DP 1033626). The second memorandum addressed whether claims could be asserted by asbestos claimants under certain provisions of the New York Business Corporation Law following corporate dissolution. (PX 127 at DP 1033642–43).

which took over Keene's bearings and filtration division. One impetus for this development was the decision in May 1982 by Richard Shantz to return to Michigan for family reasons. He had run the bearings division in Michigan for ten years but had come to New York City in 1981 to become Keene's President. Bailey wanted to retain Shantz's services and suggested that he return to running the bearings business in Michigan. Bailey also contemplated combining Keene's bearings business with its filtration business and eventually converting the combined business into an independent public company. Shantz agreed to the request. (Bailey Decl. ¶ 35; Bailey Dep. at 764–65; Shantz Dep. at 31–33, 36–37).

In 1983, Keene sold Old Kaydon's assets to a newly-created subsidiary of Bairnco called BZ Purchase, the predecessor to defendant Kaydon. Thereafter, BZ Purchase changed its name to "Kaydon Corporation," and for ease of reference I refer to it as Kaydon. For Old Kaydon's assets, Kaydon gave Keene total consideration of $97.5 million, consisting of $65 million in cash, the assumption of some $23 million in liabilities,[3] and an additional $9.5 million in cash to reimburse Keene for transaction-related tax liabilities. (DXs 180, 181, 183, 184, 209; PX 363 at §§ 2.3, 2.4(a)).[4] Kidder Peabody & Co. ("Kidder") conducted an analysis, after the transaction was negotiated, and concluded that the consideration of $65 million in cash for the assets and assumption of the stated liabilities represented "fair value." (DX 177 at KP 521–22).

---

**3.** These consisted of $14 million in long-term debt and $9.442 million in current liabilities as of October 29, 1983. (DX 185 at KAYDON8394).

**4.** Kaydon and Keene entered into a Tax Payment Agreement providing for Kaydon to pay

In April 1984, all of the stock of Kaydon was spun off to the shareholders of Bairnco. (DX 209).

In the course of the two or three years after the Kaydon transaction, Keene made nine separate acquisitions with a total purchase price, including assumed liabilities, of $58.75 million; these were all viable operating companies at the time they were purchased, and they replaced the operating capacities of the transferred divisions. (DXs 170 at LIPPE 365608, 565 at LIPPE 770500, 205 at LIPPE 31648, 207 at BZ 3006959, 221 at LIPPE 126233–34, 222 at LIPPE 371602, 242 at LIPPE 371654, 257 at LIPPE 8059, 273; Cafiero Dep. at 60–62; *see also* Tersigni Dep. at 304–11).

### (b) *Genlyte*

In 1981, Bairnco acquired Lightolier, Inc. ("Lightolier"), a lighting company that had been in business for more than 75 years. (DXs 99, 105 at DG 9856, 9877). At least twice during the 1970s, Bailey had approached Fred Heller, the CEO of Lightolier, about the possibility of Keene acquiring Lightolier. Heller was not interested because he wanted Lightolier to remain an independent, public company. (Heller Dep. at 47–55, 79–80, 355–57; Bailey Dep. at 729–30). By the late 1970s, Keene had three divisions and one subsidiary that did lighting business, but unlike Lightolier, these were not significant presences in the lighting industry. (Heller Dep. at 209–10; Cafiero Dep. at 48; McCord Dep. at 23; Bailey Dep. at 732–33).

In 1981, Lightolier was confronted with a hostile tender offer. (DX 105 at DG

Keene $9.5 million. (DX 210 at BZ2002484–85). Kaydon's Annual Reports show that $8.55 million was paid in 1984 and the balance in 1985. (DXs 245 at KAYDON 9307–08, 270 at KAYDON 9340–41).

9856). Eventually, Bairnco entered the picture as a "white knight" and acquired Lightolier. A key consideration for Heller was Bailey's stated intention to spin off businesses into independent companies, for this was consistent with Heller's continued desire to operate Lightolier as an independent company. (Heller Dep. at 87, 364–65; Bailey Dep. at 731, 850–51).

In August 1981, Bairnco created BZ Acquisition and BZ Holdings. Between August and November 1981, BZ Holdings acquired approximately 80% of Lightolier's outstanding stock. On January 18, 1982, Lightolier merged with BZ Holdings, with Lightolier as the surviving entity, making Lightolier a wholly-owned subsidiary of BZ Acquisition and a second-tier subsidiary of Bairnco. (DXs 99, 103).

After Bairnco acquired Lightolier, Heller remained committed to the concept of running Lightolier as an independent, public company. (Heller Dep. at 373; Bailey Decl. ¶ 38). In 1983, a consulting group advised Bairnco that the lighting industry was undergoing major consolidation and that smaller and medium-sized companies would have difficulty competing. In early 1984, Bairnco decided to consolidate Lightolier with Wide–Lite, another Bairnco lighting subsidiary, and Keene's lighting business ("Keene Lighting"). The businesses were consolidated within BZ Acquisition, under the aegis of Lightolier's management. KCS Lighting, a subsidiary of BZ Acquisition, was created to buy Keene Lighting from Keene. (DX 246 at LIPPE 84220; Bailey Dep. at 845–47; Bailey Decl.

¶ 40; McCord Dep. at 46–49; Fichthorn Decl. ¶ 24).

Heller and Eugene Cafiero, then-president of Keene, negotiated a price for the sale of Keene Lighting to KCS Lighting: $45 million in cash plus the assumption by KCS Lighting of some $17 million in certain liabilities. There were actual negotiations, as KCS Lighting initially offered $40 million and then offered $42 million and Keene demanded $50 million at one point. (DXs 225, 227; Heller Dep. at 211–19, 221–27, 406–10; McCord Dep. at 46–47, 82–85, 121–25; Bailey Decl. ¶ 43).[5]

Notwithstanding the preliminary agreement of $45 million, Keene eventually asked for a higher amount to account for tax consequences from the transaction. Keene and KCS Lighting ultimately agreed on a final purchase price of $52.5 million in cash plus approximately $17 million in assumed liabilities. (DXs 223, 225; Heller Dep. at 211, 221–27, 408–09, 412, 474; McCord Dep. at 85). The final purchase price was $8 million to $10 million over book value, and the transaction resulted in a net gain of approximately $1.4 million on Keene's books. (Heller Dep. at 424–26; DX 523 at DG 606). Heller testified that he believed KCS Lighting was paying far too much. (Heller Dep. at 412–13, 425–26). Cafiero testified that he was pleased with the price. (Cafiero Dep. at 205).

Keene asked Kidder to perform a fairness analysis of the proposed purchase price of $52.5 million for the assets of Keene Lighting and the assumption of certain of the liabilities. Kidder concluded

---

**5.** The Court has been unable to find evidentiary support for the $17 million figure for assumed liabilities. The Court uses this number, however, because plaintiffs do not appear to contest it. The number is used repeatedly in defendants' papers. (*See, e.g.,* Bairnco Mem. at 56; Genlyte Mem. at 17). Plaintiffs have not challenged it, and their Rule 56.1 statement merely takes issue with Genlyte's assertion that Keene and KCS "arrived at" a purchase price of $52.5 million in cash plus $17 million in assumed liabilities, not disputing the numbers but contending that Bairnco set the purchase price. (Pls.' Am. Rule 56.1 Statement, Resp. to Genlyte's 56.1 Statement ¶ 83).

that the consideration constituted "fair value." (DX 230 at KP 1023–24).

The sale of Keene Lighting was approved and became effective July 1, 1984, and Keene transferred Keene Lighting to KCS Lighting. (DX 225). Bairnco consolidated the lighting businesses in August 1984. Bairnco's Form 10–K and its 1984 Annual Report both disclosed Keene's sale of Keene Lighting. (DX 246 at LIPPE 84220, 84222, DX 247 at KP 8282, 8286, 8289).

The Genlyte Group ("Genlyte") was incorporated on January 24, 1985 and became a wholly-owned subsidiary of Bairnco. On February 6, 1985, BZ Acquisition was merged into Genlyte, with Genlyte as the surviving entity and thus becoming the owner of Bairnco's lighting businesses.

On August 1, 1988, Genlyte was spun off to Bairnco's stockholders. (DX 368; Heller Dep. at 453–54; Fichthorn Decl. ¶ 26). Genlyte borrowed from its lenders and issued bonds to raise the funds to pay off a $168.8 million inter-company loan balance with Bairnco. Bairnco, in turn, paid $100 million of those funds to Keene to reduce inter-company payables, giving Keene $100 million in liquid assets. (Heller Dep. at 456–57; McCord Dep. at 51–54; DX 462 at BZ 1012449).

After the sale of the lighting businesses, Keene's net worth increased from 1984 to 1985 (see page 366 supra); its cash flow from operations increased during 1984 (DX 467 at KELT 3516), and its net sales increased in 1985. (Id.).

### (c) Kasco

Since 1967, Keene had owned a small cutting services business ("Cutting Services") that manufactured bandsaw blades and grinder plates and knives and provided supplies and services to the supermarket industry. (Fichthorn Decl. ¶ 31; DX 285).

In 1986, Bairnco created a new subsidiary, Kasco, to acquire the stock of Atlantic Services Company ("ASC"), a competitor of Cutting Services that was similar but somewhat larger, for some $11.7 million (including certain assumed debt). (DXs 274, 277, 279, 462 at BZ 1012450; Edmondson Dep. at 99, 106–08). Kasco and ASC entered into a stock purchase agreement on May 6, 1986. (DXs 282, 284; Fichthorn Decl. ¶ 34). The plan was to combine ASC with Cutting Services to create a more substantial cutting services company.

Shortly thereafter, but still in 1986, Kasco purchased Cutting Services from Keene for $9.0 million, plus the assumption by Kasco of certain liabilities. (DXs 279, 282, 290). This followed a valuation analysis by Kidder, which concluded that $9.0 million was "fair value" for the transaction. (Tansill Decl. ¶ 9 & Ex I; DXs 285, 289, 292). Management officials of Keene and Bairnco testified that they believed that $9.0 million plus the assumption of certain liabilities was fair value for Cutting Services. (Bailey Decl. ¶¶ 50–53; DXs 279, 282, 287, 288; Bailey Dep. at 878–83; Fichthorn Dep. at 334–35; Edmondson Dep. at 147, 152–54). Bairnco's 1986 Form 10–K disclosed Keene's sale of Cutting Services to Kasco. (DX 314 at 3, 12, 15). Kasco financed the purchase by borrowing $9.0 million from Bairnco, which in turn borrowed the funds from a bank.

The $9.0 million purchase price was based primarily on a comparison to the purchase price of $11.7 million paid for ASC, a price that was reached after arm's-length negotiations. (Fichthorn Dep. at 334–35; Fichthorn Decl. ¶ 34; DX 285; Edmondson Dep. at 128–32).

Although Kasco management had wanted to spin it off, Kasco never became a

viable candidate for a spin-off because its revenues never increased to the necessary levels. (Fichthorn Decl. ¶¶ 29, 51; DXs 330, 360, 372, 398, 418, 449 at BZMK 258; Edmondson Dep. at 185–91; Fichthorn Dep. at 336–37).

**(d)** *Shielding Systems*

In two separate sales in January 1987 and April 1988, Keene sold businesses to Shielding Systems, a newly-created subsidiary of Bairnco.

**(1)** *Shielding Businesses*

In 1986, the managers of several of Keene's construction companies advocated combining those businesses (the "Shielding Businesses") into a new subsidiary of Bairnco that would provide materials and services for the construction of large-scale installations to block electromagnetic signals, for use in testing electronic weapons systems and devices. (DXs 265, 295, 297, 304; Zais Dep. at 86–94, 227–32; Bertrand Dep. at 64; Bailey Dep. at 889–90, 904, 918–19). The Shielding Businesses were not performing well in the mid–1980s. (DX 312 at KP 933, 937, 981). Bailey lured Arnold Zais, the former head of some of these businesses, out of retirement, by promising that if the companies were "turned ... around," Shielding would be a future candidate for spin-off. (Zais Dep. at 88–89; *see* DXs 265, 295). Keene and Bairnco decided that it would be best to put the Shielding Businesses together and bring Zais back to run them, with a view toward a spin-off at some point in the future. (DXs 265, 295, 297, 304 at LIPPE 95315–16, 312 at KP 932–34, 329 at BZ 89137; Bailey Dep. at 888–90, 904, 918–19; Zais Dep. at 86–94, 227–32; Bertrand Dep. at 58–64).

Keene and Bairnco set the purchase price at $25.0 million in cash (plus the assumption of certain liabilities) and man-

agement officials testified that they believed this would be fair (or more than fair) consideration for the Shielding Businesses. (DXs 309, 310, 311; Bailey Dep. at 885–86; Fichthorn Dep. at 338–42; Zais Dep. at 102, 118–19).

Kidder was asked to do a fairness evaluation. It did so and concluded that $25.0 million (plus the assumption by the buyer of certain liabilities) represented "fair value." (Tansill Decl. ¶ 9 & Ex. J). The sale went forward on January 1, 1987, to Shielding Systems, a newly-created Bairnco subsidiary. Shielding Systems paid $25.0 million to Keene, financed through a $5.0 million contribution from Bairnco and a $20.0 million loan from Bairnco. Bairnco borrowed these funds from a bank. (DX 462 at BZ 1012441, 1012452–53, 1012592–613; DXs 164 at DP 1020933, 321, 499; Fichthorn Decl. ¶¶ 15, 42).

**(2)** *Versitron and Micro Chassis*

After the sale of the Shielding Businesses, Keene still owned two operations, Versitron and Micro Chassis, in areas related to the government and electronic enclosure business. Keene had purchased Versitron and Micro Chassis in 1984, for $15 million and $7.2 million, respectively. (DXs 200, 240, 242 at LIPPE 371643, 371654; Bailey Dep. at 888). In the mid to late 1980s, Micro Chassis was not performing well and there were some who believed that Versitron also was not performing up to its potential. (DX 345; DX 348 at KP 1138, 1143, 1145, 1219, 1241, 1248–55; DX 349 at BZ 64099–106, 64107–14; Bertrand Dep. at 335–48; Cafiero Dep. at 100–02. *But see* Zais Dep. at 108).

In the meantime, the Shielding Businesses that had been purchased by Shielding Systems were also struggling. (DXs 312 at KP 933, 353, 361, 365 at BZ 104142; DX 340 at BZ 119138, 119148; Bailey Dep. at 906–07). In February 1988, the manag-

ers of Shielding Systems, Versitron, and Micro Chassis proposed that the businesses be combined, with the hope that such a combination would lead to better performances. (DXs 344, 345, 346; Bailey Dep. at 899–901, 918–19).

Bairnco, Keene, and Shielding Systems decided that Shielding Systems would acquire Versitron and Micro Chassis for $24.5 million in cash and the assumption by Shielding Systems of certain liabilities. (DXs 343, 344, 345, 349, 351, 353, 357, 387 at BZ 16192; Bailey Dep. at 899–902, 918–19; Zais Dep. at 103–09; Fichthorn Decl. ¶ 27(a)). Bertrand, the CEO of Shielding Systems, testified that he believed the price was too high, as did Fichthorn, an investment banker and Bairnco director and CEO. (Bertrand Dep. at 80–82; Fichthorn Decl. ¶¶ 2, 3, 39. *But see* Bailey Dep. at 899–901; Zais Dep. at 107).

Kidder was engaged to perform a valuation and it concluded that the proposed price of $24.5 million for Versitron and Micro Chassis represented "fair value." (DX 354; Tansill Decl. ¶ 9 & Ex. K).

The sale proceeded on April 2, 1988. (DXs 350, 352, 356). Bairnco disclosed Keene's sale of these businesses in its 1988 Annual Report and a Form 10–Q. (DXs 365 at BZ 104142, 387 at BZ 16192, 16195). Shielding Systems paid the purchase price to Keene, obtaining funds via an intercompany advance from Bairnco. (Fichthorn Decl. ¶¶ 15, 42; DX 462 at BZ 1012441, 1012453, 1012616–33; DXs 164 at DP 1020933, 350, 359).

The strategy did not work, as the Shielding System businesses, including Versitron and Micro Chassis, continued to perform poorly. (DXs 394, 417, 422, 428; DX 430 at LIPPE 93598, 93600; Zais Dep. at 104–07, 142–45). In 1989, just a year after it was acquired by Shielding Systems, Versitron was found to have overstated its inventory by $3.2 million. (DX

428 at BZAMZ 1331; Bertrand Dep. at 335–48). It was subsequently sold to management for less than $1.0 million. (Fichthorn Decl. ¶ 52). Micro Chassis never turned a profit; Shielding Systems discontinued Micro Chassis's business in 1989 and sold its remaining assets for $1.6 million in 1990. (DXs 430 at LIPPE 93598, 449 at BZMK 264; Fichthorn Decl. ¶ 52).

The Shielding Systems businesses acquired from Keene were discontinued in 1993 and eventually disposed of. (DXs 430 at LIPPE 93598, 449 at BZMK 254, 461 at BZMK 230, 239; Fichthorn Decl. ¶ 52).

### e) *Arlon*

In 1987, Bailey asked certain Keene managers to consider whether Keene's various small laminates and coatings businesses could be combined into one larger company. (Roy Dep. at 50, 60–68). Management identified several Keene businesses, including a laminating business, a graphics and silk-screening business, a manufacturer of materials for electronic circuit boards, and a manufacturer of specialized microwave materials, as potential candidates for merging into one unit that would enjoy certain synergies. (Kaufman Dep. at 138–46; Roy Dep. at 17–18, 60–69).

On August 10, 1988, Arlon was created as a subsidiary of Bairnco to purchase these businesses from Keene. The expectation was that Arlon would acquire the businesses and eventually be spun off. (DXs 370, 371, 377 at BZ 64863, 378, 388 at BZ 65722–23, 407; Bailey Dep. at 918–20; Roy Dep. at 72–75, 80–81, 90–91).

Keene and Bairnco conducted valuation analyses and set the purchase price at $44.0 million, plus Arlon's assumption of certain liabilities, including a $3.0 million industrial revenue bond and a $1.1 million cash deficit. (Kaufman Dep. at 170–71,

174; Tansill Decl. ¶ 9 & Ex. L; Tansill Dep. at 179–80; DX 563 at KP 9714).

Kidder performed a fairness analysis and concluded that the proposed price represented "fair value" for the businesses in question. (DXs 415, 563; Tansill Decl. ¶ 9 & Ex. L). Keene's sale of the companies went forward in June and July of 1989. (DXs 412, 414, 416). Management officials of Keene, Bairnco, and Arlon testified at deposition that they believed that the purchase price was fair value. (Bailey Dep. at 909–10; Kaufman Dep. at 274, 289–90; Bailey Decl. ¶¶ 50, 53). Arlon paid $44 million to Keene, which was financed by a $10 million advance from Kasco and a $34 million loan from a bank. (DX 462 at BZ 1012454–55, 1012637–42, 1012646–48). Arlon also assumed Keene's obligations under a $3.0 million bond and a $1.1 million cash deficit. (DX 563 at KP 9714). Bairnco disclosed Keene's sale of the businesses to Arlon in a 1989 Form 10–K. (DX 432 at DP 1040520).

Arlon was never spun off and remains a part of Bairnco.

### 3. *The Dividends*

Keene paid quarterly dividends to Bairnco from the second quarter of 1981 until the second quarter of 1990 in amounts calculated as a percentage of Keene's net income. (Bailey Decl. ¶¶ 58, 59; Fichthorn Decl. ¶ 44). Keene's board decided to pay dividends in the amount of 45% of Keene's net income for the previous quarter. (Fichthorn Decl. ¶¶ 44, 45; DX 104; Coyne Dep. at 131, 135). Keene followed this policy until 1990. (Fichthorn Decl. ¶¶ 45–47; DX 481 at KELT 460–62). Keene's board approved resolutions declaring cash dividends to Bairnco at its regular meetings. (*See, e.g.,* DXs 117, 278, 367).

According to plaintiffs, Keene paid dividends to Bairnco as follows:

| | |
|---|---|
| 1981 | $3.393 million |
| 1982 | $7.375 million |
| 1983 | $7.824 million |
| 1984 | $7.363 million |
| 1985 | $5.679 million |
| 1986 | $1.669 million |
| 1987 | $3.544 million |
| 1988 | $5.698 million |
| 1989 | $4.540 million |

(Pls.' Opp'n Mem. at 252 (chart)).

### 4. *Keene's Demise*

On March 23, 1990, ARKO advised Andersen that because of "certain events," including developments in the asbestos litigations, it was "no longer possible for us to state with assurance that there will not be a material adverse effect upon Keene's financial position as of the date hereof or in the immediate future." (DX 442). Shortly thereafter, Keene left the Center and launched its own asbestos compensation program. This met with initial success, as 10,540 claims were settled in 1990 with the average per-case settlement and defense costs falling, while Keene won 95% of the cases that went to trial. (DX 485 at 7, 14, 15, 53; Bailey Decl. ¶ 19). In 1991, however, Keene was forced to try more cases, its rate of success dropped significantly, and the average jury award rose substantially. (DX 485 at 15).

By the spring of 1993, Keene was unable to raise the funds needed for supersedeas bonds for appeals. In December 1993, Keene filed a petition for reorganization under Chapter 11 of the Bankruptcy Code.

Keene had continued to operate through 1993. In fact, Keene's 1990 annual report shows that its net sales increased 33% from 1989 to 1990. (DX 450 at LIPPE 96357).

### B. *Prior Proceedings*

This case was filed in 1996. There was extensive motion practice and voluminous

discovery. Discovery closed long ago. Defendants filed motions to exclude certain expert testimony as well as these motions for summary judgment.

On January 28, 2003, I granted defendants' expert motions and ruled that plaintiffs were precluded from calling three expert witnesses, including the only two witnesses designated by plaintiffs to offer opinions on the value of the transferred businesses. *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y.2003).

I heard argument on the instant motions on February 6, 2003. At the argument, plaintiffs' counsel handed up to the Court a report of a new valuation expert, Laureen M. Ryan, and asked the Court to accept it and to re-open discovery. I declined, but advised plaintiffs that they could make a formal motion if they desired.

After the argument, plaintiffs made two motions: (1) a motion to substitute Ryan as a new valuation expert or, alternatively, to permit an existing expert to file a report on valuation; and (2) a motion to supplement the existing summary judgment record with Ryan's report.

For the reasons set forth below, plaintiffs' additional motions are denied. As a consequence, I decide defendants' summary judgment motions based on the existing record.

### *DISCUSSION*

#### A. *Applicable Legal Principles*

##### 1. *Actual Fraud*

Plaintiffs' actual fraud claims are brought pursuant to § 276 of the New York Debtor and Creditor Law, which provides:

> Every conveyance made and every obligation incurred with *actual intent,* as distinguished from intent presumed in law, *to hinder, delay, or defraud* either

present or future creditors, is fraudulent as to both present and future creditors.

N.Y. Debt. & Cred. Law § 276 (McKinney 2003) (emphasis added). Hence, to prevail on a § 276 claim, a plaintiff must prove that a defendant acted with actual intent to hinder, delay, or defraud creditors.

A plaintiff asserting a claim under § 276 must prove actual fraud by "clear and convincing evidence." *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 639 (2d Cir. 1995). On these motions for summary judgment, then, the issue is whether, with all conflicts in the evidence resolved and all reasonable inferences drawn in favor of plaintiffs, the record contains sufficient evidence from which a reasonable jury could find actual fraud under the clear and convincing standard. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[C]lear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions.").

As the use of the disjunctive "or" makes clear, "[o]nly an actual intent to hinder and delay need be established, not an actual intent to defraud." *United States v. Carlin,* 948 F.Supp. 271, 277 (S.D.N.Y.1996). In addition, a transfer may be fraudulent under § 276 even if the transferor pays "fair consideration," as long as the transfer was made with "actual intent to hinder, delay, or defraud." *HBE Leasing,* 48 F.3d at 639; *see also RTC Mortgage Trust 1995–S/N1 v. Sopher,* 171 F.Supp.2d 192, 200 (S.D.N.Y.2001). In other words, the payment of fair consideration does not preclude liability under § 276 if the requisite intent is proven.

Because "[f]raudulent intent is rarely susceptible to direct proof," *In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983), plaintiffs often seek to prove intent to defraud circumstantially by proof of cer-

tain "objective facts"—"badges of fraud"—that give rise to an inference of intent to defraud. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540–41, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Among these "badges" are: 1) gross inadequacy of consideration; 2) a close relationship between transferor and transferee; 3) the transferor's insolvency as a result of the conveyance; 4) a questionable transfer not in the ordinary course of business; 5) secrecy in the transfer; and 6) retention of control of the property by the transferor after the conveyance. *See BFP*, 511 U.S. at 541, 114 S.Ct. 1757; *Cadle Co. v. Newhouse*, No. 01 Civ. 1777(DC), 2002 WL 1888716, at *5 (S.D.N.Y. Aug. 16, 2002); *RTC Mortgage Trust*, 171 F.Supp.2d at 201. Of course, the flip side of these badges of fraud is that their absence—or evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control—would constitute evidence that there was no intent to defraud.

■ The existence of actual intent to defraud is never presumed, and intent to defraud cannot be found "based merely on suspicion, conjecture, or doubtful inference." *Lowendahl v. Baltimore & Ohio R. Co.*, 247 A.D. 144, 287 N.Y.S. 62, 76 (1st Dep't), *aff'd*, 272 N.Y. 360, 6 N.E.2d 56 (1936); *accord Rosenthal v. Rochester Button Co.*, 148 A.D.2d 375, 539 N.Y.S.2d 11, 12–13 (1st Dep't 1989).

■ A significant legal issue in dispute between the parties is the requirement of damages. Seizing on the concept that payment of fair value does not preclude an actual fraud claim under § 276, plaintiffs argue that no proof of damages resulting from the fraudulent conveyance is required; a transfer with harmful intent would suffice. (2/6/03 Tr. at 59–63, 68,

102–03; *see id.* at 99–102, 104–05). Plaintiffs are incorrect, for some injury flowing from the wrongful conduct must be demonstrated. Indeed, it is hornbook law that "[a] conveyance cannot be fraudulent as to creditors if the debtor's solvency is not affected thereby, that is, if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors." 30 N.Y. Jur.2d *Creditors' Rights & Remedies* § 305 (2003) (citing *Bryce v. Nat'l City Bank*, 93 F.2d 300 (2d Cir.1937); *Newfield v. Ettlinger*, 22 Misc.2d 769, 194 N.Y.S.2d 670 (1959); *Prudential Sav. Bank v. Grant*, 99 N.Y.S.2d 602 (1950)); *accord Sharp Int'l Corp. v. State St. Bank & Trust Co.*, 281 B.R. 506, 522 (Bankr. E.D.N.Y.2002) (dismissing § 276 claim where transaction did not "adversely affect [transferor's] ... ability to repay its ... creditors"). Unless the conveyance diminishes the value the debtor's estate, the claimant has "no pecuniary harm ... or right of objection ... since the assets of the transferor are no less after the questioned transfer was made than before." *Id.*

In each of the cases cited by plaintiffs, there was injury caused by the conveyance because assets were placed beyond the reach of creditors. *HBE Leasing*, 48 F.3d at 639–40 (payment of fees depleted assets available to future creditors); *Atlanta Shipping Corp. v. Chem. Bank*, 631 F.Supp. 335, 339 (S.D.N.Y.1986), *aff'd*, 818 F.2d 240 (2d Cir.1987) (payment of loans depleted assets available to creditors); *DeWest Realty Corp. v. I.R.S.*, 418 F.Supp. 1274, 1279 (S.D.N.Y.1976) (conveyance resulted in insolvency of estate); *Le Cafe Creme, Ltd. v. Le Roux*, 244 B.R. 221, 239–40 (Bankr.S.D.N.Y.2000) (conveyance deepened debtor's insolvency); *Flushing Sav. Bank v. Parr*, 81 A.D.2d 655, 438 N.Y.S.2d 374, 376 (2d Dep't 1981) (proper-

ty placed outside of creditors' reach); *Scholtz v. Yastrzemski*, 247 A.D. 823, 286 N.Y.S. 694, 695 (2d Dep't 1936) (not addressing debtor's solvency but citing cases of depleted estates in support of holding). In this case, then, even assuming plaintiffs were able to prove an actual intent to defraud, they could not recover unless they also proved that the conveyances diminished Keene's assets. Because the consideration was paid directly to Keene (as opposed to one of Keene's creditors or some other entity), as a practical matter plaintiffs can show a diminishment in Keene's assets only by proving that less than fair value was paid.

## 2. Constructive Fraud

█ Plaintiffs assert constructive fraud claims under § 273 of the Debtor and Creditor Law, which provides:

> Every conveyance made ... by a person who is or will be thereby rendered *insolvent* is fraudulent as to creditors without regard to his actual intent if the conveyance is made ... *without a fair consideration.*

N.Y. Debt. & Cred. Law § 273 (emphasis added). Hence, to prevail on a § 273 constructive fraud claim, a plaintiff need not prove intent to defraud but instead must show: (1) a conveyance (2) without fair consideration (3) by a person who is insolvent or who becomes insolvent as a consequence of the transfer. *See United States v. McCombs*, 30 F.3d 310, 323 (2d Cir. 1994). These elements must be proven by a preponderance of the evidence.[6]

A person is considered insolvent under the Debtor and Creditor Law when: "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law § 271.

█ The Debtor and Creditor Law defines "fair consideration" as follows:

> Fair consideration is given for property ...
>
> a. When in exchange for such property, ... as a fair equivalent therefor, and in good faith, property is conveyed ..., or
>
> b. When such property ... is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property....

*Id.* § 272. As the language of the statute suggests, the concept of fair consideration has two components—the exchange of fair

---

**6.** Although the Court is unaware of any case specifically holding that a preponderance standard applies to a § 273 claim, I conclude this is the appropriate standard for the following reasons. First, fraudulent intent is not an element. Second, cases addressing the burden of proof in § 273 cases have not applied a clear and convincing standard. *See, e.g., McCombs*, 30 F.3d at 323–24 (not applying clear and convincing standard for § 273 claim while doing so for § 276 actual fraud claim); *United States v. Hansel*, 999 F.Supp. 694, 699 (N.D.N.Y.1998) (holding that, "[g]enerally speaking, the party challenging the conveyance has the burden of proving both insolvency and the lack of fair consideration," without specifying preponderance standard but not requiring clear and convinc-

ing evidence). Third, courts have applied a preponderance standard to constructive fraud claims brought under other statutes. *See, e.g., In re Bennett Funding Group, Inc.*, 232 B.R. 565, 570 (Bkrtcy.N.D.N.Y.1999) (applying preponderance standard to fraudulent conveyance claim under Bankruptcy Code § 548(a)(1)(B)). The cases do hold that in some circumstances, such as where a transaction was between family members and was made without any tangible consideration, the burden is on the transferees to prove the fairness of the transaction. *McCombs*, 30 F.3d at 323–24 (citing cases). Those circumstances do not exist here, and plaintiffs have not argued otherwise. (*See* Pls.' Opp'n Mem. at 207).

value and good faith—and both are required. *Petersen v. Vallenzano,* 849 F.Supp. 228, 231 (S.D.N.Y.1994); *In re Skalski,* 257 B.R. 707, 711 (Bankr. W.D.N.Y.2001); *In re Le Cafe Creme,* 244 B.R. at 241. For purposes of § 272, the "good faith" at issue is the good faith of the transferee, as opposed to, in the case of actual fraud under § 276, the good faith of the transferor. *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1059 n. 5 (2d Cir. 1995).

▆▆▆▆ Whether "fair consideration" is paid must be determined on a case-by-case basis. *McCombs,* 30 F.3d at 326; *Am. Inv. Bank, N.A. v. Marine Midland Bank, N.A.,* 191 A.D.2d 690, 595 N.Y.S.2d 537, 538–39 (2d Dep't 1993). Fair consideration does not require dollar-for-dollar equivalence; consideration can be fair even if it is less than the value of the transferred property, as long as it is an amount that is not "disproportionately small" as compared to the value of the transferred property. *In re Tesmetges,* 85 B.R. 683, 696–97 (Bankr.E.D.N.Y.1988).

## B. *Application*

Plaintiffs' claims raise three key factual issues: (1) whether Keene received fair value for the assets it transferred; (2) whether Keene was insolvent or would become insolvent as a result of the transfers; and (3) whether Keene and its management acted with intent to hinder, delay, or defraud asbestos creditors. Although the absence of fair value and insolvency are not elements of the actual fraud claims, these issues are nonetheless relevant to the actual fraud claims as possible "badges of fraud."

As I consider each area, I am mindful of my task on these summary judgment motions: I am not to decide disputed issues of fact, but I am reviewing the record solely to determine whether sufficient evidence exists to permit a reasonable jury to find for plaintiffs on their constructive fraud and actual fraud claims, under the appropriate standard of proof. In doing so, I must not make credibility determinations, and I must resolve all conflicts and ambiguities in the evidence and draw all reasonable inferences in favor of plaintiffs.

I discuss each of the three factual areas in turn. I also separately discuss plaintiffs' opposition to the summary judgment motions.

### 1. *Fair Value*

▆▆▆▆ The record does not contain sufficient evidence to support a jury finding, under either a preponderance or clear and convincing standard, that less than "fair value" was paid in any of the transactions in question. In this context, I distinguish between "fair value," the monetary value of the consideration given for the transferred property, and "fair consideration," which requires both "good faith" on the part of the transferee and "fair value."

First, plaintiffs have not presented any admissible evidence to show that less than fair value was paid for any of the transactions in question. In granting defendants' *Daubert* motions, I struck the opinions of Mr. Dewey and Dr. Evans that the transferred companies were worth hundreds of millions of dollars more than the consideration Keene received. As plaintiffs acknowledged at oral argument of the *Daubert* motions, these were their only valuation experts. (1/10/03 Tr. at 13). At oral argument of the summary judgment motions, plaintiffs' counsel essentially conceded that the record contains no evidence to support the claim that less than fair value was paid. When asked what evidence remained in the record to show that "less than fair consideration was paid," plaintiffs' counsel was unable to point to any such evidence.

(2/6/03 Tr. at 53–54). Instead, counsel resorted to a legal argument, contending that "[e]ven if otherwise equivalent value is exchanged, the lack of good faith itself will preclude a finding that fair consideration has been given." (*Id.* at 54).

Second, the record contains substantial evidence that fair value was paid. In fact, the record is clear that the acquiring companies gave substantial consideration for Keene's companies: $97.5 million (including $23 million in assumed liabilities and $9.5 million in tax payments) for Old Kaydon; $69.5 million (including $17.0 million in assumed liabilities) for Keene Lighting; $9.0 million (not including assumed liabilities) for Cutting Services; $49.5 million (not including assumed liabilities) for Shielding Businesses, Versitron, and Micro Chassis; and $48.1 million (including $4.1 million in assumed liabilities and deficits) for Arlon. Moreover, Kidder performed fairness analyses and concluded in every instance that the agreed consideration represented "fair value." Finally, former officers of the various companies testified at their depositions that fair (or more than fair) consideration was paid; although plaintiffs challenge the veracity of this testimony, they have presented no evidence to dispute it.

On this record, then, in the absence of any evidence that less than fair value was paid and in light of defendants' substantial evidence that fair value was paid, a reasonable jury could only conclude that plaintiffs have failed to prove, either by clear and convincing evidence or by a preponderance of the evidence, that less than fair value was paid with respect to any of the transactions in question.

Hence, plaintiffs cannot prove fair value for purposes of the fair consideration element of their constructive fraud claims. Nor can they prove damages for either their actual fraud or their constructive fraud claims, and both the actual fraud and constructive fraud claims must be dismissed on this basis alone. Even assuming defendants acted with fraudulent intent, plaintiffs have not presented evidence from which a jury could find that the transactions resulted in a diminution in Keene's assets. Because the consideration was paid directly to Keene, plaintiffs cannot show that the consideration was put beyond the reach of Keene's creditors. For example, Kaydon gave Keene $97.5 million in consideration for Old Kaydon. If Old Kaydon was actually worth only $97.5 million, there could be no injury, for Keene's assets were not diminished as it received fair value. If, on the other hand, the consideration had been paid not to Keene but to a third party, the conveyance would harm creditors, even though fair value was paid, for the consideration would have been placed beyond the reach of Keene's creditors. Because the consideration was paid to Keene, however, no injury flows from the transaction.

## 2. *Solvency*

The record does not contain sufficient evidence to permit a jury to find, either by a preponderance of the evidence or by clear and convincing proof, that Keene was insolvent at the time of the transactions or payment of dividends or that Keene's management believed that Keene was insolvent or on the verge of insolvency. A reasonable jury could only find that Keene had, or believed it had, more than sufficient assets to cover its probable liabilities at the time of the transactions—1983 (Kaydon), 1984 (Genlyte), 1986 (Kasco), 1987 and 1988 (Shielding Systems), and 1989 (Arlon)—and during the years it paid dividends. Hence, two areas are presented for discussion: assets and liabilities.

In terms of assets, the undisputed record shows that throughout the 1980s and as late as 1991, Keene had a positive net worth. Indeed, its net worth increased from $70.7 million at year-end 1980 to $134.1 million at year-end 1991. With one exception, Keene's net worth increased each year there was one of the contested transactions. For example, Old Kaydon's assets were sold in 1983, but Keene's net worth increased from $94.0 million at year-end 1982 to $105.9 million at year-end 1983. The one exception was 1986, the year of the Kasco transaction, but even then the drop was modest: the net worth fell from $120.1 million at year-end 1985 to $116.5 million at year-end 1986. The drop was only temporary, as net worth went back up to $123.3 million the next year.

Moreover, it is undisputed that Keene had substantial insurance coverage. After the District of Columbia Circuit ruled in October 1981 in the *INA* case and the Supreme Court denied the petition for certiorari in March 1982, Keene had some $390 million in insurance coverage, not including coverage for defense costs. It also had an asbestos reserve fund of more than $15 million as of year-end 1982. By 1989, because of additional insurance, Keene had coverage of some $413 million and a reserve fund of some $18 million for the asbestos cases. It also had other substantial amounts of cash and liquid assets as well.

Finally, of course, Keene received substantial assets as a result of the transactions—$273.6 million in cash, assumed liabilities, and other consideration. The cash portion of this consideration was also available for the payment of claims.

As to liabilities, although the circumstances changed over time, clearly plaintiffs cannot prove that the "fair salable value" of Keene's assets was less than the amount of its *"probable liability* on [its]

existing debts as they [became] absolute and matured." N.Y. Debt. & Cred. Law § 271 (emphasis added). Plaintiffs must prove that at the time of each of the transactions the "fair salable value" of its assets—which included $390 million or more in insurance coverage, a net worth ranging from $94.0 million at year-end 1982 to $131.7 million at year-end 1989 (including a reserve fund ranging from $15 $18 million and other substantial amounts of cash and liquid assets), and the consideration received from the transactions—was insufficient to pay its "probable" liabilities. On this record, they cannot meet that burden.

As to the first three transactions, Kaydon in 1983, Genlyte in 1984, and Kasco in 1986, and as to the dividends paid during those years, there can be no doubt. In light of the actual number of cases filed and the number of new cases predicted, and in light of the per-case cost of resolving these cases (including defense costs), Keene reasonably believed that there was more than sufficient insurance. In 1983, Keene anticipated that a total of 32,138 cases would be filed at a total cost of approximately $196 million; there was then more than $391 million in available insurance. (*See* Bairnco Mem. at 22 (chart)). Even in 1986, when the estimated number of cases increased to 86,362 (in the ACF, including cases in which Keene had not been sued), the estimated total cost was $302 million; again, there was more than $351 million in insurance still available then. (*Id.*).

No reasonable jury could find that Keene actually believed its *probable* liabilities would exceed the amount of insurance coverage, the reserve fund, and its other substantial assets. Of course, no one could predict the future. The *Manville* case provided some guidance and it provided some confirmation that Keene's predic-

tions were reasonable.[7] Moreover, Keene was hotly contesting many of these cases and it believed that many of the cases were meritless and that the amounts sought were exaggerated. In fact, from 1984 through 1990, it won 97% of the cases that went to verdict, and lost only a total of $192,143 in the cases in which there were adverse verdicts. These were not "debts" in the sense that they were liquidated amounts; rather, they were tort claims for personal injuries.[8] Moreover, solvency must be gauged at the time of the transfer and not with the benefit of hindsight. See Am. Inv. Bank, 595 N.Y.S.2d at 538–39; Durland v. Crawford, 172 A.D. 283, 158 N.Y.S. 692, 693 (3d Dep't 1916) ("The validity of a conveyance does not depend upon subsequent events.").

The transactions and payment of dividends in 1987, 1988, and 1989 are a closer call, for the number of claims had increased significantly, the insurance was being consumed, and Keene was unable to estimate the number of future cases from January 1987 through January 1989. Nonetheless, I conclude that even as to these years no reasonable jury could find that Keene knew that its insurance cover-

age, reserve fund, and other assets would be insufficient to cover its probable future liabilities. In 1988, for example, even more insurance coverage was found, the number of new case filings actually dropped, and the per-case cost also decreased significantly for cases processed at the Center. As of year-end 1987, 1988, and 1989, respectively, Keene had cash and liquid assets of approximately $75 million, $110 million, and $140 million.

The record also contains substantial evidence that Keene's managers believed that the asbestos problem could be overcome. ARKO provided an opinion letter each year reiterating its belief that, largely because of the insurance coverage, the asbestos cases would not have a material impact on Keene's financial condition. Likewise, each year Andersen gave Keene an unqualified opinion as to its financial condition. Keene's managers have stated, under oath, that they believed the asbestos claims would not cause Keene to become insolvent. Throughout the 1980s, Keene won the vast majority of the cases that actually went to trial, and many of the claims were without merit—at least Keene's managers so believed. As Bailey,

---

**7.** Stanley Levy, one of the Trust's attorneys in this case, submitted an affidavit in the *Manville* case challenging Manville's attempts to forecast the number and cost of asbestos claims as speculative. He said:

> In reality, ... neither a ceiling nor a floor of future disease occurrence was estimable with any degree of certainty at all. ...
> There was ... uncertainty caused by whether and for how long the recent trend of increasing numbers of lawsuits would continue. ...
> The fact of the matter is that no one knows what these costs [resolving future asbestos claims] will be.

(DX 187 at LIPPE 87548, 87565–66, 87528).

**8.** *See, e.g., In re Babcock & Wilcox Co.,* 274 B.R. 230, 254 (Bankr.E.D.La.2002) ("[I]t is clear that determining asbestos liability for an asbestos defendant is far from completely sci-

entific."); *Shelly v. Doe,* 249 A.D.2d 756, 671 N.Y.S.2d 803, 806 (3d Dep't 1998) (in sexual abuse tort case, holding that tortfeasor's "probable debt" to victim by virtue of tortious conduct should not be considered for fraudulent conveyance determination because it was "entirely speculative" at time of transfer); *see also Staten Island Sav. Bank v. Reddington,* 260 A.D.2d 365, 687 N.Y.S.2d 707, 709 (2d Dep't 1999) ("[M]ere existence of a contingent debt, without more, is insufficient to support a finding that such a debt represented a 'probable liability' within the meaning of Debtor and Creditor Law § 271."); *MFS/Sun Life Trust v. Van Dusen Airport Servs. Co.,* 910 F.Supp. 913, 936 (S.D.N.Y.1995) (New York courts have not "imported the concept of foreseeability into an analysis of actual intent to defraud").

Keene's chairman, testified at his deposition in this case:

> Keene could earn its way out of the asbestos liability. And I never changed my mind on that right on up to the bankruptcy, as you well know, and from the limited fund. I have always believed that and I believe that today. We could have met every obligation under our meritorious claims and we would be on our way to being a billion dollar corporation with 4,000 jobs. I believe that. I believed that then and I believe it now.

(Bailey Dep. at 666).

Plaintiffs have presented evidence that Keene believed the asbestos problem to be a serious one, including Bailey's statement to the Senate Subcommittee on Labor (PX 212), but that fact is hardly in dispute and it does not constitute evidence that Keene knew that someday it would be overwhelmed by the asbestos cases. Plaintiffs also offer projections made by an expert, Dr. Mark Peterson, to show that Keene's projections were wrong. Of course, it is what Keene believed back in the 1980s, at the time of the transfers, that controls, not analyses performed now with the benefit of hindsight. Moreover, it is also irrelevant that Keene was wrong in its projections, for plaintiffs must show that Keene *knew* it was wrong to prove fraudulent intent.

Plaintiffs' evidence is insufficient to present a genuine issue for trial because even in the worst case scenario, a reasonable jury could not find that Keene was insolvent or believed that it would be rendered insolvent. Even assuming that Keene knew that eventually 100,000 cases would be filed against it, and even assuming that Keene knew that it would cost an average of $5,000 per case to resolve the cases, the "probable liability" still would have been only $500 million—still significantly less than the total of the $413 million in insurance coverage, $93 million in insurance reimbursement for defense costs, $273.6 million in consideration received for the transferred property, and the value of Keene's other substantial assets (including large amounts of cash on hand).

### 3. *Intent*

The final factual area is defendants' state of mind—whether a reasonable jury could find that defendants engaged in the transactions with the intent to hinder, delay, or defraud.

First, I discuss the direct evidence, to the extent it exists, bearing on the issue of intent. Second, as plaintiffs proceed principally on a "badges of fraud" theory, I consider the circumstantial evidence of fraud. Third, I discuss the issue of intent in the context of plaintiffs' dividends claim.

#### a) *The Direct Evidence*

The record does contain substantial direct evidence on the issue of defendants' intent—but it shows that defendants acted in good faith. As discussed above, defendants have presented extensive, largely uncontradicted evidence that defendants engaged in the transactions in good faith: the purchasing defendants paid substantial consideration that constituted fair value for the assets; they relied on the advice of lawyers, including ARKO and Debevoise; they did not go forward with a no-consideration transaction that could have been viewed as a fraudulent conveyance; they relied on fairness opinions provided by Kidder; they relied on the existence of $380 million and more of insurance coverage; and they could not have known until much later that some 100,000 asbestos claims would be filed against Keene.

In contrast, plaintiffs have presented no direct evidence of an intent to defraud,

hinder, or delay on the part of defendants. After years of discovery, including the production of hundreds of thousands of pages of documents, dozens upon dozens of depositions, and numerous experts, plaintiffs have not uncovered any direct evidence of intent to defraud.

### b) *The Badges of Fraud*

Of course, plaintiffs rely heavily on the cases that hold that intent to defraud is rarely provable by direct evidence and they rely instead on circumstantial evidence—the badges of fraud. I consider the evidence in the record as to: (i) the adequacy of the consideration; (ii) the relationship between the transferee and transferors; (iii) the transferor's solvency; (iv) the circumstances of the transfers; (v) whether the transfers were conducted in secrecy; and (vi) whether the transferor retained control of the "transferred" assets.

### (i) *Consideration*

As discussed above, on this record a reasonable jury could only find that the transferees paid fair value for the assets. In fact, substantial amounts were paid and the record contains extensive evidence to show that the consideration was fair. On the other hand, plaintiffs have presented no admissible evidence to show that less than adequate consideration was paid. Plaintiffs certainly have not presented evidence from which a jury could find that the consideration paid was grossly inadequate or disproportionately small. Accordingly, a reasonable jury could only find that this factor strongly shows there was no intent to defraud, hinder, or delay.

### (ii) *Relationship Between Parties*

■ Here, the transferor and the transferees were affiliated companies. This "badge" of fraud, however, is a weak one, for the companies were, for the most part, independent corporations run by separate officers and management. *See, e.g., United States v. McCombs,* 928 F.Supp. 261, 274–75 (W.D.N.Y.1995) (mere fact parties to transfer are related or under common control does not establish lack of good faith); *Case v. Fargnoli,* 182 Misc.2d 996, 702 N.Y.S.2d 764, 767–68 (1999) (close relationship between transferor and transferee, by itself, not sufficient proof of intent to defraud); *see also Rebh v. Rotterdam Ventures, Inc.,* 277 A.D.2d 659, 716 N.Y.S.2d 457, 459 (3d Dep't 2000) (absent other evidence of fraud, nothing inherently improper about a subsidiary's transfer of assets to its parent company), *leave to appeal denied,* 96 N.Y.2d 705, 725 N.Y.S.2d 277, 748 N.E.2d 1073 (2001). The relationships here were significantly different from the family relationships—a husband conveying property to his wife, for example, or a mother conveying property to her son—one typically sees in fraudulent conveyance cases. Nor did the transactions involve sham or dummy corporations or fictitious parties. Hence, no reasonable jury could find that this factor provides any meaningful indication of fraud.

### (iii) *Solvency*

For the reasons set forth above, a reasonable jury could not find that Keene was rendered insolvent or that its management believed it would be rendered insolvent as a result of the transactions. A reasonable jury could only find that this factor undercuts the claim of intent to defraud, hinder, or delay creditors.

### (iv) *Circumstances of the Transfers*

■ No reasonable jury could find that there was anything suspicious or questionable about the transfers here. Although the transfers were not in the ordinary

course of business, there were legitimate business reasons for them. Even assuming management's concern over the asbestos cases was a motivating factor, there was nothing inappropriate about a company's management looking for lawful ways to reduce the adverse impact of asbestos litigation.

These were multi-million dollar corporate transactions. The terms were negotiated and substantial consideration was paid—the transaction generated large amounts of cash for Keene. No effort was made to put that cash out of the reach of creditors; no assets were secreted away. Keene was not cash-strapped; to the contrary, it had substantial amounts of cash and other liquid assets on hand, including more than $140 million as of December 31, 1989.

Lawyers and investment bankers were involved. Keene consulted with Debevoise as early as 1980 and Debevoise, in essence, warned Keene that it could not engage in transactions that had even the appearance of a fraudulent conveyance. As a consequence, Keene dropped its initial proposal to spin off Old Kaydon for *no* consideration. Instead, Keene eventually engaged in a transaction whereby it required the transferor to give some $97 million in consideration. It brought in an investment banking firm, Kidder, to render an opinion on the fairness of the consideration being given, and Kidder confirmed that fair value was being received.

Of course, fraudulent conveyances can be found in commercial settings, such as where a corporation has been "gutted" by its former owners and left behind as a "shell company unable to pay its debts." *MFS/Sun Life*, 910 F.Supp. at 933, 935. *See generally* Edward S. Adams & Arijit Mukherji, *Spin–Offs, Fiduciary Duty, and the Law*, 68 Fordham L.Rev. 15, 36–38 (1999). Here, Keene was not "gutted" nor was it left as a "shell company unable to pay its debts." Rather, it continued to operate as a thriving business for a number of years, paying its debts as they became due. Its net worth continued to grow throughout the 1980s. The transactions generated substantial amounts of cash for Keene. Keene used the proceeds from the Kaydon transaction, for example, to fund nine acquisitions, over the next two or three years, of thriving companies that replaced the operational capacity of the transferred assets. After the Genlyte transaction, not only did Keene's net worth grow, so did its cash flow and net sales. These actions and developments surely were inconsistent with an intent to gut Keene and hide its assets from future creditors.[9]

9. This case is therefore distinguishable from *Schmoll v. ACandS, Inc.*, 703 F.Supp. 868 (D.Or.1988), *aff'd*, 977 F.2d 499 (9th Cir. 1992), where Judge Panner held that a holding company was responsible on a successor in liability theory for a predecessor corporation's liability for asbestos claims. The court found that the corporate restructuring "was designed with the improper purpose of escaping asbestos-related liabilities." *Id.* at 874. The transactions, however, came at a point when the company had already exhausted 71% of its almost $400 million in insurance coverage. Moreover, the company had been having much less success in defending the asbestos cases, and it had, in fact, been assessed more than $75 million in punitive damages. *Id.* at 873. In addition, very little of the consideration for the transferred assets was in cash: of the $76.9 million purchase price, only approximately $15 million was in cash, $16 million was in stock (which could not have been liquidated "for anything approaching that value"), and $46 million was in unsecured notes. *Id.* at 871. Finally, little was left behind after the transactions—"staggering asbestos liabilities, unprofitable operations, unsecured notes, and stock which could not be sold in large blocks without a deep discount." *Id.* at 873.

Accordingly, I conclude that no reasonable jury could find that the circumstances of the transfers in this case constitute a "badge" of fraud.

### (v) *Secrecy*

The transactions here were not done in "secret" and there was no effort to "hide" any aspect of the transfers. To the contrary, the transfers involved public companies and were done openly. They were reported in Keene's (or Bairnco's) publicly-filed reporting statements. A reasonable jury could only find that this factor weighs heavily against a finding of fraud. *See In re Carletta*, 189 B.R. 258, 262–63 (Bankr. N.D.N.Y.1995) (finding no fraudulent intent where transaction was not concealed, there was no evidence of secret dealings or misrepresentations, and transaction was conducted with advice of counsel).

### (vi) *Control*

Here, the transferor (Keene) did not retain any control over any of the assets, and plaintiffs have presented no evidence to show otherwise. Hence, a reasonable jury could only find that this factor weighs against a finding of fraud.

### c) *Dividends*

██ The discussions above of solvency and direct evidence apply to plaintiffs' claim that the payment by Keene of dividends to Bairnco throughout the 1980s constituted fraudulent conveyances. As for the badges of fraud, some of the factors are relevant and some are not. Of course, no consideration was paid for the dividends and there was a close relationship between Bairnco and Keene, but this is always the case in a dividends situation and it is a generally accepted practice for a corporation to pay dividends to its shareholders. On the other hand, as a reasonable jury could only find, the dividends were approved by the board of Keene, in consultation with attorneys and investment bankers, based on dividends paid by comparable companies and a policy adopted in 1981. Before each quarterly dividend the Board reviewed Keene's financial condition, and there was always substantial cash on hand. The dividends were not paid in secret but were reported in the financial statements. The payment of the dividends to Bairnco clearly did not cause Keene's demise. No reasonable jury could find that Keene paid the dividends to Bairnco to keep the assets away from asbestos creditors. *Cf. State v. First Investors Corp.*, 156 Misc.2d 209, 592 N.Y.S.2d 561, 569 (1992) (finding transferor had actual intent to defraud where it stated it was unlikely to pay dividends in near future and then declared a special dividend, approximately two-thirds of which went to its directors).

In sum, no reasonable jury could find, by clear and convincing evidence, that defendants acted with the actual intent to hinder, delay, or defraud creditors. Hence, the actual fraud claims must be dismissed for this reason as well. Likewise, to the extent that "good faith" is a consideration for the constructive fraud claim on the issue of "fair consideration," the result would be the same under the less burdensome preponderance of the evidence standard.

## C. *The Remaining Claims*

There remain plaintiffs' additional claims, including their claims for successor liability and piercing the corporate veil and claims against Bailey. All of plaintiffs' remaining claims are dependent on the factual issues discussed above. Accordingly, summary judgment is granted dismissing these claims as well.

## D. *Plaintiffs' Motions*

██ Plaintiffs' motions for leave to substitute a new valuation expert (Laureen M. Ryan) or to file a supplemental report by an existing expert (Loreto T. Tersigni) and to supplement the summary judgment record with Ryan's report are denied.

This case has been pending for seven years and the parties, their lawyers, and the Court have devoted an extraordinary amount of attention to it. Extensive discovery was conducted and the parties negotiated and the Court approved specific discovery schedules, which were extended numerous times. Finally, the Court scheduled *Daubert* and summary judgment motions and, indeed, trial, with a view toward bringing this case to a resolution.

Plaintiffs designated valuation experts some 18 months ago and discovery concluded some 10 months ago. Even before then, however, plaintiffs had retained Tersigni and his accounting firm to perform some work, including valuations. In 1997, Tersigni's firm prepared preliminary valuations of the transferred businesses; its valuations, however, were so low for three of the six sales as to virtually eliminate any injury to Keene.

Plaintiffs adjusted. They retained new valuation experts: Dewey in early 1998 and Evans in mid–2000. Both arrived at much higher values for the transferred businesses. It was not until August 31, 2001, however, that plaintiffs finally served expert reports for Dewey and Evans.

For the next 17 months, defendants prepared their defense based on the understanding that Dewey and Evans were plaintiffs' valuation experts. Defendants had their own valuation experts, of course, who had to study Dewey's and Evans's reports, assist defense counsel in responding to them, and then prepare their own reports. Defendants expended great effort in uncovering the flaws in plaintiffs' experts' reports.

Dewey and Evans were deposed in March of 2002. It was obvious from their deposition testimony that their analyses and conclusions were flawed and, as I later held, wholly unreliable. Evans, for example, repeatedly acknowledged that she had to re-visit certain conclusions. But there was no follow-up.

In July 2002, defendants filed two sets of motions: *Daubert* motions to exclude the testimony of Dewey and Evans and summary judgment motions. The summary judgment motions relied, in part, on the *Daubert* motions. The briefing was extensive (some 978 pages for the summary judgment briefs alone, not including attachments), and some 32 binders of exhibits, affidavits, and deposition transcripts were submitted to the Court. The trial date had to be adjourned as the parties needed additional time to file opposition and reply papers. Finally, the *Daubert* motions were argued and the Court ruled, granting the motions in all respects.

Two days before the argument of the summary judgment motions, plaintiffs raised the possibility of designating a new valuation expert. At the outset of the argument of the summary judgment motions, plaintiffs' counsel handed up a new valuation report, prepared in just eight days, setting forth Ryan's opinions as to the values of the transferred businesses. Although Ryan relies in part on two valuation theories used by Dewey and Evans, she also discusses three new theories not relied on by Dewey or Evans. Ryan's opinion also depends on additional data not relied on by Dewey or Evans or, for that matter, by Kidder.

At this juncture in the case, I will not allow Ryan to be used in place of Dewey and Evans, nor will I permit her report to

be added to the summary judgment record, nor will I permit Tersigni to file a "supplemental" report on valuation.

This is not the way the Federal Rules of Civil Procedure work. Plaintiffs do not get a "do-over." As the Supreme Court has held:

> It is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail.... In this case, for example, although [plaintiff] was on notice every step of the way that [defendant] was challenging his experts, he made no attempt to add or substitute other evidence.

*Weisgram v. Marley Co.*, 528 U.S. 440, 455–56, 120 S.Ct. 1011, 145 L.Ed.2d 958 (2000); *see also Brooks v. Outboard Marine Corp.*, 234 F.3d 89 (2d Cir.2000) (affirming grant of summary judgment for lack of evidence of causation after testimony of plaintiff's causation expert was excluded under Rule 702); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 250 (6th Cir.2001), *cert. denied*, 534 U.S. 822, 122 S.Ct. 56, 151 L.Ed.2d 25 (2001) ("[F]airness does not require that a plaintiff, whose expert witness testimony has been found inadmissible under *Daubert*, be afforded a second chance to marshal other expert opinions and shore up his case before the court may consider a defendant's motion for summary judgment."); *Colon ex rel. Molina v. Bic USA, Inc.*, 199 F.Supp.2d 53, 68 (S.D.N.Y.2001) ("If a proffer of expert testimony is excluded as inadmissible pursuant to [Fed.R.Civ.P.] 702, the court must make the summary judgment determination on a record that does not include that evidence.").

Plaintiffs had more than a full and fair opportunity to find proper valuation experts. In fact, they had years to do so. After they chose Dewey and Evans, plaintiffs were placed on notice, months ago, that their reports, opinions, and testimony were flawed in many respects. Yet, plaintiffs made no effort to add or substitute other experts—until all the motions, including the summary judgment motions, had been filed and briefed and the *Daubert* motions had been decided.

Defendants would be highly prejudiced if the Court were to grant plaintiffs' motions. They would be required to have their experts study and evaluate Ryan's report (or Tersigni's "supplemental" report). Defendants would have to depose Ryan (or re-depose Tersigni). Defendants' experts would have to prepare new reports and perhaps be re-deposed as well. There would be a new round of *Daubert* motions and a new round of summary judgment motions. This would surely take another year, if not longer.

But it is more than just delay and additional work and expense. Rather, it would be fundamentally unfair to require defendants to go through the process again, to delay the final resolution of this very difficult and burdensome case, solely because plaintiffs made some ill-advised tactical choices and refused to adjust when it was apparent that they should. When a party loses at trial or when it loses a summary judgment motion, it does not get to do it again. It does not get a chance to come up with more evidence or to try to make a more persuasive presentation or to try to write a more coherent brief. That is not the way our system of justice works. The party's recourse is to appeal, and only if it prevails on appeal will it get another chance. A *Daubert* motion is no different.

Plaintiffs make three other points that warrant brief discussion. First, they complain that I commented at the February 6, 2003 argument that "[p]resumably, Dewey and Evans were the best that the plaintiffs could come up with" and that by bringing

in Ryan now, they were bringing in the "B team." (Pls.' Mem. To Substitute Ryan at 6 (quoting 2/6/03 Tr. at 5); 2/6/03 Tr. at 5). Obviously, I had not reviewed Ryan's report at that point and I did not *know* whether she was the "B team." I did, however, presume that plaintiffs had done the best they could when, with the luxury of time, they designated Dewey and Evans. It is largely irrelevant whether Ryan is the "B team" or whether she was the "A team" and plaintiffs decided to use the second string instead.

Second, plaintiffs complain that the Court unilaterally adjourned the trial shortly after the summary judgment motions were argued, suggesting that the Court could also have adjourned the trial and the summary judgment motions to permit plaintiffs to substitute Ryan as a new expert. (Pls.' Mem. To Substitute Ryan at 3). Plaintiffs should read nothing into my decision to adjourn the trial. First, that is the Court's prerogative. Second, I adjourned the trial only because I had decided by then that, based on what I had read and heard, I was going to grant the summary judgment motions. Of course, it was going to take me some time to write the decision, and I did not believe it was fair to require the parties to continue preparing for trial when I knew I was going to grant the motions. In fact, if I had decided to deny the motions, I would have held the parties to the scheduled trial date.

Finally, plaintiffs attack my *Daubert* decision as "draconian" (Pls.' Mem. To Supplement Summ. J.R. at 1) and complain that "tens of thousands" of asbestos victims will suffer because they will be without a remedy. (Pl. Mem. To Substitute Ryan at 5). As for whether my decision is "draconian," I will let my opinion speak for itself. *See Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y.2003). As for the al-

leged "tens of thousands of victims," no injustice will result from my ruling if there are no meritorious claims against these defendants. Moreover, the Federal Rules are not relaxed merely because the plaintiffs sue on behalf of a class of sympathetic tort victims. *See Nelson,* 243 F.3d at 250–51 n. 6 (in case alleging that defendants dumped PCBs into environment knowing children lived and played in area, court affirmed grant of summary judgment motions following grant of *Daubert* motions, even though trial court declined to give plaintiffs opportunity to cure defects in proffered expert testimony).

### *CONCLUSION*

Plaintiffs' motions for leave to substitute a new expert or to add a supplemental expert report and to supplement the summary judgment record are denied. Defendants' motions for summary judgment are granted. The amended complaint is dismissed, in all respects, with prejudice and with costs. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.